Nash v. Clark.

E. J. NASH, Respondent, v. LEE L. CLARK, ROB-
ERT N. BENNETT, T. F. CARLISLE, LINCOLN
CARLISLE and RICHARD CARLISLE, Appel-
lants.

No. 1406.    (75 Pac. 371.)

1. **Eminent Domain: Public Use: Irrigation.**
   The provision in the federal and state Constitutions that pri-
   vate property shall not be taken for public use without com-
   pensation is construed to mean that private property can
   not be taken for strictly a private use.

2. **Same.**
   Property is taken for a public use, within the provision of the
   Constitution declaring that private property shall not be
   taken for public use without compensation, when the taking
   is for a use that will promote the public interest, and will
   tend to develop the resources of the State.

3. **Same.**
   The taking of property for the purpose of obtaining water for
   the irrigation of a farm and to render the same productive
   is a taking for a public use, and hence the owner of the
   farm may condemn a right of way through another's ditch
   for the purpose of carrying the water to his land for irri-
   gation. BASKIN, C. J., dissenting.

(Decided January 23, 1904.)

Appeal from the Fourth District Court, Utah County.—
*Hon. J. E. Booth,* Judge.

Action to condemn a right of way in a ditch owned
by the defendants. From a judgment in favor of the
plaintiff, the defendants appealed.

AFFIRMED.

*J. W. N. Whitecotton, Esq.,* for appellants.

*Messrs. Warner, Houtz, Prentiss & Warner* for re-
spondent.

### STATEMENT OF FACTS.

Plaintiff brought this action to condemn a right of way in a ditch owned by the defendants. The provisions of the statute upon which he bases his right of action, so far as material to this case, are as follows: Rev. St. 1898, section 3588, in part provides: "Subject to the provisions of this chapter the right of eminent domain may be exercised in behalf of the following public uses: . . . (5) Reservoirs, dams, water-gates, canals, ditches, flumes, tunnels, aqueducts, and pipes for supplying persons, mines, mills, smelters, or other works for the reduction of ores, with water for domestic or other uses, or for irrigating purposes, or for draining and reclaiming lands, or for floating logs and lumber on streams not navigable. (6) Roads, railroads, tramways, tunnels, ditches, flumes, pipes, and dumping places to facilitate the milling, smelting, or other reduction of ores, or the working of mines; outlets, natural or otherwise, for the deposit or conduct of tailings, refuse, or water from mills, smelters or other works for the reduction of ores, or from mines; mill dams; . . . also an occupancy in common by the owners or possessors of different mines, mills, smelters, or other places for the reduction of ores, of any place for the flow, deposit, or conduct of tailings or refuse matter. . . . (10) Canals, reservoirs, dams, ditches, flumes, aqueducts, and pipes for supplying and storing water for the operation of machinery for the purpose of generating and transmitting electricity for power, light, or heat." Section 1277, Rev. Stat. 1898, is as follows: "Any person or corporation shall have the right of way across and upon public, private, and corporate lands, or other right of way, for the construction, maintenance, repair, and use of all necessary reservoirs, dams, water-gates, canals, ditches, flumes, tunnels, or other means of securing, storing, and conveying water for irrigation, or for any necessary public use, or for drainage, upon payment of just compensation there-

for, but such right of way shall in all cases be exercised in a manner not to unnecessarily impair the practical use of any other right of way, highway, or public or private road, nor to unnecessarily injure any public or private property. Such right may be acquired in the manner provided by law for the taking of private property for public use.''

Section 1278 provides: ''When any person or corporation desires to convey water for irrigation, or for any other beneficial purpose, and there is a canal or ditch already constructed that can be enlarged to convey the required quantity of water, then such person or corporation, or the owner or owners of the lands through which a new canal or ditch would have to be constructed to convey the quantity of water necessary shall have the right to enlarge said canal or ditch already constructed by compensating the owner of the canal or ditch to be enlarged for the damage, if any, caused by said enlargement: provided, that said enlargement is to be done at any time from the first day of October to the first day of March, or at any other time that may be agreed upon with the owner of said canal or ditch.''

The complaint herein in substance alleges that plaintiff is the owner of 80 acres of land situated in Utah county, this State, which land, without irrigation, is arid, barren, and unproductive, but with irrigation would produce in abundance, hay, grain, and other agricultural crops; that Ft. Canyon creek is a natural stream of water in Utah county, flowing from the mountains north of plaintiff's land in a southerly direction to and near plaintiff's land, that the defendants own a tract of land contiguous to and adjoining plaintiff's land on the north, and are also the owners of a certain ditch leading from Ft. Canyon creek over and across their land to a point within 100 feet of plaintiff's land, which ditch is a mile and a quarter in length, 18 inches wide, and 12 inches deep; that plaintiff owns water in Ft. Canyon creek sufficient to irrigate his land above mentioned; that there is no other convenient or practic-

able way in which to divert the waters of said creek and convey the same onto plaintiff's land except by and through the ditch of defendants; that, in order to irrigate his land, it is necessary that plaintiff have a right of way through defendants' ditch; that for plaintiff to enter upon defendants' land to enlarge their ditch will not injure them; that plaintiff requested of defendants that they allow him to go onto their land and enlarge their ditch, and use it for conducting his water to and on his land, and offered to contribute his share of the expense of maintaining the ditch and all damages; that the defendants refused to permit him to do so.

Plaintiff asks that he be permitted to enlarge defendants' ditch to the extent of widening it one foot more; that he have a perpetual right of way through said ditch when so widened, and constructed for the purpose of diverting and carrying his water from Ft. Canyon creek to his land for irrigation purposes; that the damages for such right of way and use of the ditch by plaintiff be fixed and determined, and that upon payment by the plaintiff of such damages he have such ditch condemned to the extent of and to the use and for the purposes above set forth, and that defendants be enjoined from in any way or manner asserting any right antagonistic to this right of plaintiff; that, if plaintiff is permitted by decree of this court to enlarge and use the ditch as aforesaid, his land can be made productive and the use of the water to which plaintiff is entitled can and will be put to a beneficial and public use in the irrigation of plaintiff's said land, and for no other purpose. Defendants interposed a general demurrer to plaintiff's complaint, alleging that the complaint does not state facts sufficient to constitute a cause of action. The demurrer was overruled. The defendants elected to stand upon their demurrer, and the plaintiff introduced evidence in support of the allegations of his complaint, and the court entered judgment and decree in favor of plaintiff, condemning defendants' land as prayed for in the

27 Utah 11

complaint; and for a reversal of this judgment the defendants have appealed to this court.

McCARTY, J., after a statement of the foregoing facts, delivered the opinion of the court.

Appellants' contend that the order of the district court overruling the demurrer was erroneous for the reason that the complaint on its face shows that the use to be made of the property sought to be condemned is strictly private, and in no sense a public use. Both the Constitution of the United States and the Constitution of this State provide that "private property shall not be taken or damaged for public use without just compensation." This provision is construed to mean that private property can not. be taken for strictly a private use, which counsel for respondent concede to be the true and proper construction. This brings us to the only question presented by this appeal, to-wit: Was the condemnation of appellants' land in this case in law and in fact for a public use? There is no fixed rule of law by which this question can be determined. In other words, what is a public use can not always be determined by the application of purely legal principles. This is evident from the fact that there are two lines of authorities, neither of which attempt to lay down any fixed rule as a guide to be followed in all cases. One class of authorities, in a general way, holds that by public use is meant a use by the public or its agencies—that is, the public must have the right to the actual use in some way of the property appropriated; whereas the other line of decisions holds that it is a public use within the meaning of the law when the taking is for a use that will promote the public interest, and which use tends to develop the great natural resources of the commonwealth. After a careful examination of the leading cases on this subject, we are of the opinion that the class of decisions last mentioned is more in harmony with enlightened public policy and that the liberal interpretation given the term "public

use'' which the Legislature has in effect, declared shall be followed in this State is far more conducive to individual and public advancement than the restricted construction adopted and followed by the line of decisions first referred to.

The question of the manner of appropriation and use of water for domestic, irrigation, mining and manufacturing purposes is, and ever since the advent of the early pioneers has been, the most important and vital of all industrial questions with which the people within this arid region have been confronted.   Their requirements, and, we might add, their absolute necessities, impelled the Legislatures and courts at an early date in the history of the States and Territories strictly arid in character to depart from and lay aside as impracticable some legal doctrines and rules relating to the control and use of water which had theretofore been adhered to and followed for ages, and to adopt and put in operation a new system of acquiring title in and to the streams which are within the arid belt, the use of which was found to be indispensable in agricultural pursuits, in mining, in the establishment of industries, and in the general development of the arid States and Territories. By an examination of the records of the early cases in this State (then Territory) wherein the court declined to follow and be governed by the common-law doctrine or riparian rights in its entirety, the same arguments were advanced by those claiming title to water under and by virtue of this doctrine as are advanced by appellants in this case, to-wit, that fundamental rights were being interfered with, and the property of one citizen was being taken and given to another.   We very much doubt whether either advocate or layman, who has witnessed the magnificent results wrought by the change, would now contend that the Constitution was overridden, or any natural or legal right of the citizens invaded and their  property confiscated, when the common-law doctrine of riparian rights was modified for the purposes of irrigation and mining, and a system for appro-

priating and acquiring title to water adopted that made it possible for populous and flourishing commonwealths to grow up where the country otherwise would have remained a desert, uninhabited, with the possible exception perhaps of an occasional cattle or sheep ranch. The question of how to increase the water supply in the arid region has steadily grown in magnitude and importance until it has become national as well as local. Congress realizing the great public necessity for an increased water supply, and appreciating the great possibilities that may be accomplished in this and other States and Territories within the arid belt by conserving and storing the high and surplus waters caused by the melting snows which in the spring months come down from the mountains in torrents, and are either wasted in the deserts or find their way into box canyons, where they can never be made available for irrigation or other useful purposes, by a provision in the enabling act (section 12) granted to this State 500,000 acres of public lands lying within the State, with which to create a fund to be used for the purpose of building reservoirs; and later on, by an act known as the "Irrigation Bill," created a fund from the public revenues, which is swelling into the millions of dollars, for the purpose of aiding in this most important of all enterprises of a public character in the arid west, and upon the success of which its future growth and prosperity largely depends. The large expenditure of public funds in this direction is not to be made for the purpose of enabling the States and Territories directly benefited thereby, in their sovereign capacity, to engage in farming and other lines of industry, which are dependent upon the water supply, but to ultimately enable the citizens, as individuals, to provide themselves with homes, and to furnish additional opportunities for the further development of the great natural resources with which the arid region abounds. These questions, which are the most important with which the arid States and Territories have had to deal, and the successive steps that have been taken in

advancing our system of irrigation, are referred to for the purpose of showing the interest that the public have always had and must of necessity continue to have in the question of irrigation. The natural physical conditions of this State are such that in the great majority of cases the only possible way the farmer can supply his land with water is by conveying it by means of ditches across his neighbor's lands which intervene between his own and the source from which he obtains his supply. The question before us not only involves the right of the farmer to invoke the law of eminent domain, when necessary, to enable him to convey water to his farm, but that of the miner, manufacturer, and persons engaged in other industrial pursuits to build canals, flumes, and lay pipe lines over adjoining and intervening lands, when necessary for the purpose of conveying water necessary for the successful prosecution of their respective enterprises. The future growth, prosperity, upbuilding, and industrial expansion of the State not only depend upon the storing and holding back the high and surplus waters so they can be used in times of scarcity, but also in a careful and judicious husbandry of the supply now available; and it is entirely within the province of the Legislature to enact such laws respecting the appropriation and distribution thereof as will tend to prevent unnecessary loss and waste, so long as vested rights are upheld and maintained. Experience has shown that, the greater the amount of water flowing in a ditch of a given size and grade, the less the percentage of seepage and evaporation. Therefore, as a general rule, the owners of canals and ditches, instead of being damaged by their enlargement and the turning therein of an additional quantity of water, as is proposed in this case, will at least in times of scarcity during the hot summer months, and especially during the periods of protracted drouths, which have become so common of late years in this State, be benefited thereby, besides receiving the market value of the land condemned. In view of the physical and cli-

matic conditions in this State, and in the light of the history of the arid west, which shows the marvelous results accomplished by irrigation, to hold that the use of water for irrigation is not in any sense a public use, and thereby place it within the power of a few individuals to place insurmountable barriers in the way of the future welfare and prosperity of the State would be giving to the term ''public use'' altogether too strict and narrow an interpretation, and one we do not think is contemplated by the Constitution.

The foregoing conclusions are supported by abundant authority. 10 Am. and Eng. Ency. of Law (2 Ed.), 1064, and cases cited. In the case of Dayton Mining Co. v. Seawell, 11 Nev. 394, the plaintiff sought to condemn a right of way over certain lands to a mining claim owned by plaintiff, to be used for the purpose of transporting wood, lumber, timbers, and other material to enable it to conduct and carry on its business of mining. The claim was made in that case, as it is in this. that the statute under which the action was brought was unconstitutional for the same reasons as are urged in the case before us. Mr. Chief Justice Hawley, speaking for the court says: ''That mining is the paramount interest of the State is not questioned. That anything which tends directly to encourage mineral developments and increase the mineral resources of the State is for the benefit of the public, and is calculated to advance the general welfare and prosperity of the people of this State, is a self-evident proposition. Hence, it necessarily follows that, if the position contended for by the petitioner is correct—and I believe it is—then the act is constitutional, and should be upheld. Although other and weaker reasons have been more frequently assigned, it seems to me that this is the true interpretation upon which courts have really acted in sustaining the right of eminent domain in favor of railroads and other objects, and in several of the decided cases this reason is expressly given. . . . Now, it happens, or at least is liable to happen, that individuals, by receiving the title

to barren lands adjacent to the mines, mills, or works, have it within their power, by unreasonably refusing to part with their lands for a just and fair compensation. . . . to greatly embarrass, if not entirely defeat, the business of mining in such localities. In my opinion, the mineral wealth of this State ought not to be left undeveloped for any quantity of land actually necessary to enable the owner or owners of mines to conduct and carry on the business of mining. Nature has denied to this State many of the advantages which other States possess, but by way of compensation to the citizens has placed at her doors the richest and most extensive silver deposits ever yet discovered. The present prosperity of the State is entirely due to the mining developments already made, and the entire people of the State are directly interested in having the future development unobstructed by the obstinate action of any individual or individuals. In the case of Oury v. Goodwin, 26 Pac. 376, practically the same question was involved as is presented here, and the Supreme Court of Arizona, in an elaborate and exhaustive opinion, in which many cases are cited and reviewed, held that the use of water for irrigation is a public use, and that an act of the Arizona Legislature, providing for the condemnation of lands for canal purposes, was constitutional. De-Graffenried v. Savage, 9 Colo. App. 131, 47 Pac. 902; Yunker v. Nichols, 1 Colo. 551; Schilling v. Rominger, 4 Colo. 100. In the case of Fallbrook Irr. Dist. v. Bradley, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369, the court, in the course of the opinion, says: "On the other hand, in a State like California, which confessedly embraces millions of acres of arid lands, an act of the Legislature providing for their irrigation might well be regarded as an act devoting the water to a public use, and therefore as a valid exercise of the legislative power. . . . To irrigate, and thus to bring into possible cultivation, these large masses of otherwise worthless lands, would seem to be a public purpose, and a matter of public interest, not confined to the landowners,

or even to any one section of the State. The fact that the use of the water is limited to the landowner is not therefore, a fatal objection to this legislation. In conclusion the court on this point further says: "We have no doubt that the irrigation of really arid lands is a public purpose, and the water thus used is put to a public use." Ellinghouse v. Taylor, 19 Mont. 462, 48 Pac. 757. There are many other well-considered cases which declare the same general doctrine as those referred to, but we deem it unnecessary to make further citations.

The judgment of the district court is affirmed; the costs of this appeal to be taxed against the appellants.

BARTCH, J., concurs. BASKIN, C. J., dissents.