THE HOWARD MILLS COMPANY v. THE SCHWARTZ
LUMBER AND COAL COMPANY.

No. 15,349.   (95 Pac. 559.)

SYLLABUS BY THE COURT.

1. EMINENT DOMAIN—*Flour-mill Operated by Steam-power.* A
   private corporation owning a mill operated by steam-power,
   and having for its purpose the manufacture and sale of flour
   and feed, cannot exercise the right of eminent domain for the
   purpose of improving and enlarging such business.

2. ——— *"Public Mills."* The provisions of chapter 65 of the
   General Statutes of 1901 do not apply to mills used merely
   for the purpose of manufacturing flour and feed for sale, and
   such mills are not made public mills by that act.

3. ——— *Statute Construed.* Section 1366 of the General Stat-
   utes of 1901 does not confer the right of eminent domain upon
   a mill or other manufacturing corporation which is merely en-
   gaged in the manufacture of flour and feed for sale by the
   use of steam-power.

Error from Sedgwick district court; THOMAS C.
WILSON, judge.   Opinion filed April 11, 1908.   Af-
firmed.

STATEMENT.

ON April 3, 1906, the Howard Mills Company began
proceedings to condemn certain real estate for its use
which belonged to the Schwartz Lumber and Coal Com-
pany.   During such procedure, and on May 17, 1906,
the Schwartz Lumber and Coal Company filed its pe-
tition in the district court of Sedgwick county to enjoin
this appropriation of its property.   The defendant an-
swered, and when the case was reached for trial it was
submitted to the court upon an agreed statement of
facts, which, so far as necessary to show the questions
presented in this court, reads:

"The plaintiff is the owner of the tract of land de-
scribed in said application and sought to be taken and
appropriated by said proceedings; that the plaintiff is
a private corporation organized under the laws of Kan-
sas, and engaged in the business of the purchase and

sale of lumber, coal and building material at retail, and uses said tract of land, so sought to be appropriated, in its said business, and desires to keep and use said tract in its said business; . . . that the defendant, the Howard Mills Company, is a private corporation organized under the laws of Kansas, and that the purpose for which it is organized is stated in its charter as follows: 'The purposes for which this corporation is formed is the manufacture and sale of flour and feed'; that said Howard Mills Company is a milling corporation using power, and is authorized to engage in the manufacture and sale of flour and feed and do all things necessary or expedient in the operation of such a mill and the manufacture and sale of flour, feed and other grain products; that in the year 1901 the said Howard Mills Company, being the owner of said tract of land, erected thereon its present mill and elevator, and from that time to the present has engaged in operating the same in the manufacture and sale of flour and feed and other grain products; that said business has been so conducted during all said time at a fair living profit; that the said mill is equipped with and operated by a steam-power plant, consisting of engine and boiler of 100 horse-power, which furnishes power capacity for manufacturing 400 barrels of flour each day of 24 hours, and is equipped with an elevator having a storage capacity of 25,000 bushels of wheat and 1000 bushels of corn and other grain; and said mill has a storage capacity of from 80,000 to 100,000 pounds of flour and 40,000 pounds of meal and feed; and said mill is equipped with modern mill machinery and apparatus of the capacity of 250 barrels of flour each day of 24 hours; that each barrel of flour contains 196 pounds of flour and consumes $4\frac{1}{2}$ bushels of wheat; and that in the ordinary operations of said mill from 50 to 65 per cent. of the horse-power capacity of said power plant is used; that the storage capacity for fuel owned by said Howard Mills Company is 25 tons of coal and 200 barrels of oil; that the ordinary daily consumption of fuel in the operation of said mills is 4 tons of coal and 15 barrels of oil; that if it were not necessary to use any part of the said mill for storing manufactured products, additions to the milling machinery and apparatus could be made which would give the said mill a milling capacity equal to the full horse-power capacity of the said power plant; that if the power plant were

used to its full capacity the consumption of fuel would be increased 25 per cent.; that it frequently happens that it is not practicable to obtain coal in car-load lots upon so short notice as 10 days; and the Howard Mills Company in the operation of its mill has frequently experienced a shortage of fuel for the operation of the same.

"That the business conducted by the Howard Mills Company in said mill.is and has been the purchase of wheat and other grain in the open market, and manufacturing the same into flour and feed and selling the same in the open markets, and manufacturing flour and feed for farmers and other customers for pay, when offered, as follows: Said Howard Mills Company will grind for pay wheat in quantities of 20 bushels or more, and will grind corn or other grain into feed for pay at any time and in any quantities, and will exchange flour and bran for wheat in any quantity upon request; and has conducted in the past, and is now conducting, a large business in such exchange for its customers, retaining a sufficient allowance from the grain so exchanged to pay its regular customary and uniform rates of exchange; that said Howard Mills Company publishes and keeps posted up in its said mill its rate of exchange, and the terms and conditions on which it will grind for pay; that under the present conditions of the milling business in Wichita and in the state of Kansas the business of grinding for toll and pay is not now carried on so far as the grinding of wheat into flour is concerned; and that the method of exchanging flour of a grade and weight corresponding to the grade and weight of the wheat offered for exchange has been substituted therefor; that the grinding of corn and other grain into feed for pay is regularly and extensively carried on by the Howard Mills Company in its said mill.

"That the object of the Howard Mills Company in appropriating the land sought to be appropriated by said proceedings is to provide facilities for the present and future increase of the milling capacity of its said mill, and the present and future increase of its business; and that the full plans and designs to be adopted in utilizing said land in said business are not matured or settled upon, and are to be so settled upon from time to time as the increase or changes in the business and operation of said mill render the same expedient or

necessary; that if the said Howard Mills Company shall acquire the land so sought to be appropriated in said proceeding, its present intention is to increase its present storage ·capacity for its flour and other mill products by erecting on said land a building substantially covering all the tract so acquired, to be set on a stone foundation, one story in height, for the storage of its manufactured products, and constructed with a view to making additions thereto for storage purposes and putting in additional machinery as the operation of said mill and the conduct of said business may from time to time render expedient or necessary; also to increase its storage capacity for fuel by erecting oil-tanks and structures for storing coal or other fuel sufficient for the efficient operation of said mill.

"That the said Howard Mills Company is desirous of extending and increasing its business by operating its mill to its full capacity, and by increasing its capacity by the addition of new buildings and additional machinery; and that it has not now the necessary land upon which to construct such additional buildings and machinery; that the said tract of land sought to be appropriated by said proceedings is the only land adjoining or near to the said mill of the said Howard Mills Company that is practical for the purpose of enlarging and extending the said mill as is desired and contemplated by the said Howard Mills Company; that the said land so sought to. be. appropriated by said proceedings owned by the plaintiff is used by the plaintiff for storing its lumber, brick and other building material as suits its convenience, and for the maintenance of coal-sheds and bins in which it stores its coal kept for sale; and that there are now no permanent buildings of any kind on said land other than said coal-sheds and bins; that the said Howard Mills Company has endeavored to purchase from the plaintiff the said tract of land so sought to be appropriated in said proceeding, and that the plaintiff has refused and still refuses to sell the same to the said Howard Mills Company or to place a price which it will accept therefor."

The land sought to be appropriated adjoins that already owned, occupied and used by the Howard Mills Company in its business.

Upon the final hearing a permanent injunction was

granted.   From that order the Howard Mills Company brings the case here for review.

*Smyth & Helm,* for plaintiff in error.

*H. C. Sluss, Kos Harris,* and *V. Harris,* for defendant in error.

The opinion of the court was delivered by

GRAVES, J.: Do the foregoing facts show the defendant, the Howard Mills Company, to be a public corporation having power to exercise the right of eminent domain?   This is the question presented.   The defendant insists that this question is answered in its favor by the statute of this state.   In support of its claim reference is made to various statutes relating to mills, among which is an act that took effect June 1, 1863, and is still in force, now being chapter 65 of the General Statutes of 1901.   Only the first section of this act is given in the brief of the defendant, but the provisions of the chapter as a whole so clearly indicate the class and character of the mills to which the act was intended to apply that it will be given in full.   It reads:

"AN ACT relating to mills and millers.

*"Be it enacted by the Legislature of the State of Kansas:*

"SECTION 1.   That all water, steam, wind or other mills whose owners or occupiers grind or offer to grind grain for toll or pay, are hereby declared public mills.

"SEC. 2.   All public mills shall grind for customers, in turn, as the grain shall be brought in, and as well as the condition of the mill will permit.

"SEC. 3.   That the owner or occupier of a public mill shall be accountable for the safe-keeping of all grain received for the purpose of being ground, and also for the articles in which such grain was received, and shall deliver the same, or the flour, meal, malt or other material ordered to be made from such grain, together with the articles in which it was received, to the owners thereof or their agent, whenever called for.

"SEC. 4.   That the owner or occupier of a public mill

shall not be liable for the loss of any grain so received, nor for the articles in which it was received, unless said articles containing and accompanying such grain be branded or marked with the initials and full surname of the owner thereof, nor for losses that may happen without the fault or neglect of the said owner or occupier, nor if by unavoidable accidents.

"SEC. 5. That the owner or occupier of a public mill shall while receiving grain to be ground give due attendance to his customers, and assist in unloading grain and loading the material made therefrom, when ground and demanded.

"SEC. 6. There shall always be kept at a public mill, by the owner and occupier thereof, a half-bushel and peck measure, tried and sealed by the proper authorities, and also proper toll-dishes for the same; and shall keep posted up, in a conspicuous place in their mill, the rates of toll.

"SEC. 7. Every owner or occupier of a public mill who shall desire to convert the same into a private mill shall give at least thirty days' notice of such intention by a proper advertisement, posted up in a conspicuous place in such mill.

"SEC. 8. That if any owner or occupier of any mill, or their representatives, agent or miller, shall violate any of the provisions of this act, they shall after due conviction thereof before any court having jurisdiction of the same be fined, for every such offense, in a sum not exceeding twenty dollars, at the discretion of the court, with costs for prosecution; said fine to be paid, one-fourth to the party aggrieved, and the balance into the fund for common schools, and moreover be liable at the suit of the party for damages." (Gen. Stat. 1901, §§ 4085-4092.)

Those familiar with the conditions existing when this law was enacted will remember the practices of mill owners which created the occasion for its passage. It will also be recalled that in those days the power of the legislature to confer the right of eminent domain upon or authorize taxation in aid of railroad corporations was earnestly denied by eminent citizens of the state. The line where the right of a private citizen to hold and enjoy his property ended and the right of a

corporation to appropriate it for its purposes began was more closely and jealously guarded then than in later years. It was even doubted, when this statute was enacted, whether the legislature had the power to regulate grist-mills (then owned almost exclusively by private individuals), as was contemplated by that law. To avoid trouble on this account they were declared to be public mills.

It was not until 1871 that the constitutionality of taxation in aid of railroads was settled in this court. (*Leavenworth County v. Miller,* 7 Kan. 479, 12 Am. Rep. 425; *The State, ex rel., v. Nemaha County,* 7 Kan. 542.) The opinion of Mr. Justice Valentine in the Leavenworth county case, concurred in by Mr. Chief. Justice Kingman, is probably the most exhaustive and elaborate of his many able decisions. The dissenting opinion of Mr. Justice Brewer in the Nemaha county case (p. 549) presents in his peculiarly clear and forcible style a most able discussion of the entire question. These facts are mentioned as matters of common knowledge, which may be considered in connection with the statute above quoted. (*The State v. Kelly,* 71 Kan. 811, 81 Pac. 450, 70 L. R. A. 450.)

The right of eminent domain was first conferred upon corporations, other than railroads, by section 88 of chapter 23 of the General Statutes of 1868, which reads:

"Lands may be appropriated for the use of macadam, plank road and telegraph corporations in the same manner as provided in this article for railway corporations, as far as applicable."

That section has been amended by adding additional corporations thereto until it now reads:

"Lands may be appropriated for the use of macadam road, plank road, hospital corporation or association, telegraph, hydraulic, irrigating, milling and other manufacturing corporations using power, and for the piping of gas, in the same manner as is provided in this article for railway corporations, as far as applicable." (Gen. Stat. 1901, § 1366.)

It is contended that the words "milling and other manufacturing corporations using power," used in this statute, when taken in connection with the law as to public mills, completely cover the mill in question. We are unable to concur in this conclusion. Chapter 65 of the General Statutes of 1901 does not seem to refer to mills such as the one owned by the defendant. No such mill was within the state of Kansas when that law was enacted, and probably no member of the legislature passing the act had ever seen such a mill. The language used in the statute applies to, and describes, the old-fashioned grist-mill—a mill operated for the accommodation of the public; a mill upon which the citizens "for miles around" were compelled to depend for the meal and flour from which their daily bread was made; a mill where the customers came on horseback, in ox wagons and other conveyances, and remained from a few hours to several days for their "turn" to be waited upon, and then received the meal, flour, shorts or bran produced from their grain; a mill where the miller received the grist at the mill door and cared for it until ground, and then returned it, less the toll taken, on demand, to the owner. In these mills customers' sacks were lost, grists exchanged, excessive toll taken, and the rights of customers neglected in various ways. The statute in question was intended, as its provisions clearly indicate, to regulate mills of this kind, and none other. The words "public mills," as there used, apply to mills of this character only.

The mill of the defendant company, as described in the agreed statement of facts, belongs to an entirely different category. It neither does, nor offers to do, such a grist-mill business. It will be seen that the first section of the law of 1863 declares what mills shall be public mills, and immediately proceeds in the next section to prescribe regulations for "all public mills," showing quite clearly the class of mills to which the words "public mills" were intended to apply.

This leaves section 1366 of the General Statutes of

1901 to be considered.  If this section be construed literally, and without reference to any other rule or law relating to the subject, it may be said to confer the power of eminent domain upon any milling or manufacturing corporation using power, without other condition or limitation; but such an interpretation would lead to results so unreasonable that it cannot be considered.  The least that can be said is that by it is meant any milling or other manufacturing corporation whose functions and uses are of the same public character as other corporations upon which this right has been conferred.  This brings us to the question, What is such a public use?  The statute gives no answer.  The question is perplexing and difficult.  Few courts have attempted to give it a clear and definite answer.  In the case of *Nash v. Clark,* 27 Utah, 158, 75 Pac. 371, 1 L. R. A., n. s., 208, 101 Am. St. Rep. 953, it was said:

"There is no fixed rule of law by which this question can be determined.  In other words, what is a public use cannot always be determined by the application of purely legal principles.  This is evident from the fact that there are two lines of authorities, neither of which attempts to lay down any fixed rule as a guide to be followed in all cases.  One class of authorities, in a general way, holds that by public use is meant a use by the public or its agencies—that is, the public must have the right to the actual use in some way of the property appropriated; whereas the other line of decisions holds that it is a public use within the meaning of the law when the taking is for a use that will promote the public interest, and which use tends to develop the great natural resources of the commonwealth." (Page 162.)

Many cases have negatively stated the rule sufficiently for the decision in hand, but leave the matter open to modification whenever local circumstances make a change necessary.  As stated by the Utah court, two rules may be deduced from the decided cases by which to determine whether a given use is public or private.  The one which seems to be sustained by the weight of authority was thus stated by the supreme

court of Minnesota in the case of *Minnesota Canal & Power Co. v. Koochiching Co.*, 97 Minn. 429, 107 N. W. 405, 5 L. R. A., n. s., 638:

"The use is not public unless the public, under proper police regulation, has the right to resort to the property for the use for which it is acquired independently of the mere will or caprice of the person or corporation in which the title of the property would vest upon condemnation." (Page. 449.)

A more elaborate statement was made by the supreme court of Maine in the case of *Brown v. Gerald*, 100 Me. 351, 61 Atl. 785, 70 L. R. A. 472, 109 Am. St. Rep. 545, as follows:

" 'Property is devoted to a public use when, and only when, the use is one which the public in its organized capacity, to wit, the state, has a right to create and maintain, and therefore one which all the public has a right to demand and share in.' . . . In a broad sense it is the right in the public to an actual use, and not to an incidental benefit. If it be a railroad company, the public have a right to be transported, and to have their goods carried from place to place, upon payment of reasonable tolls. The company must accommodate them, whether it will or no. If it be a canal or turnpike or bridge, all may travel thereon. If it be a boom company, all who have logs in the river are entitled of right to have the booms used for them. . . . These are the more ordinary kinds of *quasi*-public corporations, and they illustrate better perhaps than any definition can express the particular personal quality of the use which the public as individuals have by right in the property of such corporations. It is the right of the public as individuals to use, when occasion arises. The use must be for the general public, or some portion of it, and not a use by or for particular individuals." (Page 372.)

A few of the cases in which practically the same conclusions are reached are: *Gaylord v. Sanitary District,* 204 Ill. 576, 68 N. E. 522, 63 L. R. A. 582, 98 Am. St. Rep. 235; *Coates .v. Campbell,* 37 Minn. 498, 35 N. W. 366; *Board of Health v. Van Hoesen,* 87 Mich. 533, 49 N. W. 849, 14 L. R. A. 114; *Fallsburg, &c. Co. v. Alex-*

*ander*, 101 Va. 98, 43 S. E. 194, 61 L. R. A. 129, 99 Am. St. Rep. 855; *Cozard v. Hardwood Co.*, 139 N. C. 283, 51 S. E. 932, 1 L. R. A., n. s., 969, 111 Am. St. Rep. 779; *Healy Lumber Co. v. Morris*, 33 Wash. 490, 74 Pac. 681, 63 L. R. A. 820, 99 Am. St. Rep. 964; *Matter of Mayor, etc., of N. Y.*, 135 N. Y. 253, 31 N. E. 1043, 31 Am. St. Rep. 828; *Ulmer v. Railroad Co.*, 98 Me. 579, 57 Atl. 1001, 66 L. R. A. 387.

This rule was also approved in the case of *Irrigation Co. v. Klein*, 63 Kan. 484, 65 Pac. 687, where it was said:

"The words 'public use,' *ex vi termini*, imply that the public is interested therein, and that in its sovereign organization and capacity the public retains the right of regulation and control, at least in a limited or qualified degree, over the exercise of any corporate power or function granted in the accomplishment of such public use." (Page 493.)

The defendant is simply a private corporation authorized by its charter to manufacture flour and feed for sale. The public has no more interest in it than in the corporation from which the land in question is sought to be taken. They are both useful and important business instrumentalities, and contribute to the growth and development of the locality where they are situated. This may also be said, however, of every legitimate business. To a limited extent every honest industry adds to the general sum of prosperity and promotes the public welfare. This is not enough; a business which may invoke the right of eminent domain must be one in which the public has an exceptional and peculiar interest, and one which it might on proper occasion control and manage in the interests of the public. It seems clear that the mill in question does not sustain such a relation to the public, and therefore does not have the power to exercise the right of eminent domain.

The judgment of the district court in granting a perpetual injunction is affirmed.