2025 UT App 54

## THE UTAH COURT OF APPEALS

WILD COUNTRY HOLDINGS, LLC,
Appellant and Cross-appellee,

*v.*

WE FIVE, LLC,
Appellee and Cross-appellant.

Opinion
No. 20231150-CA
Filed April 24, 2025

Third District Court, Salt Lake Department
The Honorable Mark S. Kouris
No. 230906348

J. Craig Smith, Lisa Watts Baskin, Jennie B. Garner,
Blake D. Miller, and Deborah R. Chandler,
Attorneys for Appellant

Ben T. Welch, Cameron J. Cutler, and
Benjamin J. Mills, Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

OLIVER, Judge:

¶1     WE Five, LLC (WE Five) purchased real property on the mountainside in unincorporated Salt Lake County, Utah, on a private driveway known as Oberland Road. The property has no access to water or sewer service. After WE Five was unable to purchase an easement from neighboring property owners, Wild Country Holdings, LLC (Wild Country) and the Lambert family (the Lamberts), to install the equipment necessary to access these services, WE Five filed a lawsuit against Wild Country and the Lamberts seeking to obtain access to the land through eminent domain and easement by necessity. Wild Country and the Lamberts filed motions to dismiss, which the district court denied.

Wild Country appealed that decision. WE Five then filed a motion for immediate occupancy, which the district court also denied. WE Five appealed that decision, and this court consolidated the appeals. At oral argument, both parties agreed that the district court's denial of the motion for immediate occupancy also operated as a reconsideration and grant of the motions to dismiss. However, we decline to adopt the parties' interpretation of the record. Because we hold that WE Five does not have the right to exercise eminent domain, we reverse the district court's denial of Wild Country's motion to dismiss, which makes our review of the denial of the motion for immediate occupancy moot.

BACKGROUND[1]

*The Land at Issue*

¶2    In 1998, the owners of a parcel of land (Original Parcel) located in unincorporated Salt Lake County divided the Original Parcel into multiple parcels. In 2019, one of these parcels was sold to WE Five by warranty deed. Wild Country and the Lamberts also own parcels[2] from the Original Parcel; their parcels are located immediately to the west of the WE Five parcel. All of these properties are located along Oberland Road, a private driveway.

¶3    When the Original Parcel was divided, the prior owners of WE Five's parcel were granted an express right-of-way easement

---

1. "Because this case comes to us on an interlocutory appeal, the allegations we recite have not been tried and therefore remain allegations. Accordingly, we recount the facts as alleged and in a light most favorable to the ruling below." *State v. Willden*, 2024 UT 37, n.2, 556 P.3d 69 (cleaned up).

2. Though Wild Country owns two distinct parcels, these parcels appear to only have one street address and possess unity of title. For ease of reading, we refer to the Wild Country properties as a single property going forward.

that allowed them to access the WE Five property by crossing portions of Wild Country's and the Lamberts' properties along Oberland Road. But the easement "does not include any right to construct utilities across [Wild Country's and the Lambert's] properties."

¶4     It also appears that the parties did not have "direct access to water or sewer lines at the time the Original Parcel was severed." The Wild Country property is still not connected and uses a well for culinary water and a septic tank to dispose of wastewater. The Lambert property is connected to both Sandy City water and South Valley Sewer District (the Sewer District) sewer. [3]

*Past Attempts to Obtain Sewer at Oberland Road Properties*

¶5     Several years prior to WE Five purchasing its parcel, the Sewer District completed a preliminary feasibility study and easement research for Oberland Road but ultimately tabled the project. A couple of years later, the Sewer District again contemplated extending sewer lines to Oberland Road. It hired an engineering firm, which determined that "it would be possible to serve the area but very difficult to construct and potentially very expensive." Eventually, the Sewer District met with Sandy City, which "expressed great interest" in switching from septic tanks to sewer lines to protect the watershed. Ultimately, the Sewer District got the necessary easements from residents and decided to move forward with the project. But the Sandy City Fire Department refused to issue a permit for the project due to lack of secondary access during construction, and the project was canceled.

---

3. South Valley Sewer District has since changed its name to Jordan Basin Improvement District. For simplicity, we refer to it as the Sewer District.

*WE Five Purchases Property at Oberland Road and Seeks to Develop It*

¶6    When WE Five purchased its parcel, its manager, Dustin Freckleton, began to make plans to develop at least one house on the property.[4] An engineering firm hired by Freckleton expressed concerns about developing the property and informed Freckleton that to meet the constraints set by the Sandy City Fire Department, the existing road, which was as narrow as twelve feet with 18.5% grades in some areas, would need to be widened to twenty feet and have the grades decreased to 10%. The engineering firm also noted that these modifications would require excavating and removing material and since there are few locations where the material could be placed, "most of the material [would need to] be hauled off site," which could "create significant hardship for the neighborhood" and "push the limits of what the neighborhood would tolerate."

¶7    Despite these concerns, Freckleton approached the Sewer District about obtaining an easement to run a sewer line, and entered into a Sewer Reimbursement Agreement (the Reimbursement Agreement) with the Sewer District. The Reimbursement Agreement provided that Freckleton would "bear the total cost of constructing all sewer lines, manholes and related facilities . . . required for the servicing of [WE Five's] . . . development," and that the Sewer District would reimburse WE Five up to $400,000 for the cost of installing the pipes after the project was "completed, inspected, and approved by [the Sewer

---

4. There is a dispute among the parties about this point in both the record and their briefing. Wild Country asserts that WE Five seeks to develop at least three houses on the parcel, pointing to a subdivision plan in the record. WE Five maintains Freckleton wants to build only a house for himself. Ultimately, how many houses WE Five plans to build on the parcel does not impact the issues on appeal.

District].” The Reimbursement Agreement was valid until July 15, 2024.

¶8 The Sandy City public utilities department also supported Freckleton's project, noting it “would extend and improve public services for the neighborhood and benefit the greater public good of Sandy” by improving “the ability to protect the neighborhood and broader Sandy community from fire” and by “allow[ing] the existing septic systems to be removed,” which would alleviate risks of “groundwater contamination of the public drinking water.” Though funding reimbursement would not currently be available from Sandy City, its public utilities department extended a “conditional commitment” for Freckleton “to seek funding in future budgets” if he was able to obtain easements.

¶9 In 2023, WE Five's counsel began contacting Wild Country and the Lamberts in attempts to obtain easements over their parcels to run water and sewer lines. After attempting to negotiate for several months, WE Five informed Wild Country and the Lamberts that it would seek to secure the easements through eminent domain.

*The Litigation*

¶10 WE Five filed a lawsuit in district court against Wild Country and the Lamberts seeking to take the easement through eminent domain.[5] Wild Country and the Lamberts both filed motions to dismiss the complaint.[6] In the motions, Wild Country and the Lamberts argued that neither the Utah Constitution or Utah statutes “authorize or contemplate condemnation by private

---

5. WE Five also brought an easement by necessity claim against Wild Country and the Lamberts. That claim is not before us on appeal and remains pending before the district court.

6. The Lamberts did not file a notice of appeal and the district court's denial of their motion to dismiss is therefore not before us.

individuals or entities to advance their private development purposes, even if those private uses could arguably achieve some public benefit," and that only Sandy City and the Sewer District could exercise eminent domain to acquire the necessary easements as the entities in charge of water and sewer service.

¶11 In response, WE Five argued that Utah's statutes and case law permit it "to pursue a private eminent domain action" and that WE Five is a proper plaintiff under the statute because it "is the entity in charge of the water and sewage pipes" as WE Five would oversee and control installation of the pipes and the pipes would be within WE Five's easement.

¶12 After a hearing, the district court denied the motions to dismiss on the grounds that WE Five had "alleged sufficient facts and a legal basis to support a finding of easement by . . . eminent domain." Wild Country filed a petition for permission to file an interlocutory appeal, which this court granted.

¶13 WE Five then filed a motion for immediate occupancy. WE Five argued it met the two requirements necessary to prevail on such a motion, because (1) it demonstrated a prima facie showing of its right to condemn and (2) it had met the required elements of establishing the value of the easement, the damages that would arise from condemnation, and its "reasons for requiring a speedy occupation."

¶14 Wild Country and the Lamberts argued in response that WE Five had not demonstrated it had the authority to exercise eminent domain power, because it would not be the entity "in charge of public use" as required by statute and because the relevant statutes do not grant private entities eminent domain power for their private use. Wild Country and the Lamberts also argued that WE Five failed to show that "a speedy occupation" would be required.

¶15 The district court denied the motion on the ground that the eminent domain statute "does not apply in this case," and

therefore the court did not "reach the issue of whether immediate occupancy [was] appropriate." This ruling was inconsistent with the district court's ruling denying the motions to dismiss, both of which were based on the same argument that WE Five lacked eminent domain power. WE Five filed a petition for permission to file an interlocutory appeal, which this court also granted. The appeals were consolidated, and we address both in this opinion.

## ISSUES AND STANDARDS OF REVIEW

¶16 Wild Country contends that the district court erred in denying its motion to dismiss. "Because a [district] court's grant or denial of a motion to dismiss is a question of law, the standard of review is correctness, with no deference to the court's decision." *Vittoria v. Provo City*, 2024 UT App 99, ¶ 5, 554 P.3d 1133 (cleaned up).

¶17 On cross-appeal, WE Five asserts that the district court abused its discretion in denying the motion for immediate occupancy. A grant or denial of a motion for immediate occupancy is "within the sound discretion of the [district] court, reversible only because of obvious abuse thereof." *Utah County v. Ivie,* 2006 UT 33, ¶ 7, 137 P.3d 797 (cleaned up).

## ANALYSIS

¶18 As an initial matter, both parties agreed at oral argument that, in denying the motion for immediate occupancy, the district court effectively reconsidered and reversed its decision on the motions to dismiss and granted them. We do not see it that way. While we acknowledge that the district court's denial of the motion for immediate occupancy may have had practical implications for the litigation of the eminent domain claim, there is nothing in the record to evidence that the district court reconsidered its denial of the motions to dismiss or that it granted the motions to dismiss. We therefore treat the appeals as they

were originally presented: Wild Country appeals the denial of its motion to dismiss, and WE Five appeals the denial of its motion for immediate occupancy.

## I. Motion to Dismiss

¶19 In denying the motion to dismiss, the district court concluded that WE Five alleged both sufficient facts and a legal basis to support that Utah Code sections 78B-6-501 to -522 (the Eminent Domain Statutes) granted it eminent domain authority. "A district court's interpretation of a statute is a question of law, which we review for correctness." *Graham v. Albertson's LLC*, 2020 UT 15, ¶ 9, 462 P.3d 367 (cleaned up).

¶20 "When faced with a question of statutory interpretation, our primary goal is to evince the true intent and purpose of the legislature. The best evidence of the legislature's intent is the plain language of the statute itself." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (cleaned up). When we interpret a statute, "we assume, absent a contrary indication, that the legislature used each term advisedly according to its ordinary and usually accepted meaning" and presume "all omissions to be purposeful." *Id.* (cleaned up). In the context of eminent domain authority specifically, "we strictly construe any ambiguity in language purporting to grant the power of eminent domain in favor of the property owner and against the condemning party." *Id.* ¶ 31. Following this guidance from our supreme court, we hold, for reasons discussed below, that the Eminent Domain Statutes do not confer upon WE Five the right to condemn the property at issue here.

A. The Meaning of Public Use

¶21 Section 78B-6-501(2) of the Eminent Domain Statutes, titled "Eminent domain—Uses for which right may be exercised—Limitations on eminent domain" provides that

the right of eminent domain may be exercised on behalf of the following public uses: . . . pipes for conducting water or sewage, including to or from a development, for the use of the inhabitants of any county, city, or town; . . . [and] sewage service for . . . a city, a town, or any settlement of not fewer than 10 families . . . .

Utah Code § 78B-6-501(2)(c)(ii), (2)(i)(i). WE Five argues that the plain language of this statute establishes that installing pipes is a public use because "pipes for conducting water or sewage" is enumerated separately from "sewage service." At oral argument, WE Five reiterated this point and further suggested that installing pipes without any promise from Sandy City or the Sewer District that they would ever use the pipes would still be a valid public use. In WE Five's view, as long as the right to use the pipes has been offered to the public, WE Five will have met the criteria of section 78B-5-501.

¶22    We disagree with WE Five's reading of section 501. Though subsection 501(2)(c)(ii) specifically mentions pipes, the rest of the phrase includes the words "for the use of the inhabitants of any county, city, or town." The only way for such pipes to be used by inhabitants is if water and sewage are provided through the pipes. Otherwise, there would be pipes in the ground that inhabitants would be unable to use, which defeats the purpose of a public use. Additionally, WE Five points to subsection 501(2)(i)(i), which sets forth "sewage service" as a public use—as evidence that the legislature intended pipes to be a public use distinct from service provided through those pipes. However, there is no similar enumeration for water in subsection 501(2) outside of the mining context, which is a wholly separate use. If the legislature intended pipes and water service to be two distinct uses, then it would have enumerated a similar provision for water service, and it did not. Instead, it seems that the legislature imposed additional conditions on when sewage is considered a public use that it has not imposed on water service.

¶23    Further, our supreme court has stated that "it is a public use within the meaning of the law when the taking is for a use that will promote the public interest, and which use tends to develop the great natural resources of the commonwealth." *Nash v. Clark*, 75 P. 371, 373 (Utah 1904). Though installing pipes is part of developing our state's natural resources, burying pipes alone does not develop resources to promote the public interest. The pipes at issue here will be used solely by WE Five. And where the pipes will not be connected to the water service provided by Sandy City or the sewer service provided by the Sewer Service, it does not necessarily follow that they promote the public interest as a whole without something more.

¶24    At oral argument, WE Five pointed us to *Hawaii Housing Authority v. Midkiff*, 467 U.S 229 (1984), to support its exercise of eminent domain for a private purpose.[7] WE Five relies on *Midkiff*'s statements that the fact "that property taken outright by eminent domain is transferred in the first instance to private beneficiaries does not condemn that taking as having only a private purpose" and that the Court "long ago rejected any literal requirement that condemned property be put into use for the general public . . . in order for it to constitute a public use." 467 U.S. at 243–44 (cleaned up). WE Five notes the United States Supreme Court emphasized that whether a use is a public use turns on the takings purpose, not its mechanics. *Id.* at 244. However, WE Five takes this language out of context. *Midkiff* was dealing with the Hawaii Land Reform Act. *Id.* at 233. This act was passed after the Hawaii Legislature discovered that seventy-two private landowners

---

7. Although oral argument was the first time WE Five presented both *Hawaii Housing Authority v. Midkiff*, 467 U.S 229 (1984) and *Berman v. Parker*, 348 U.S. 26 (1954), discussed *infra* ¶ 33, "we recognize that parties have no obligation to preserve citation to legal authority, and that parties are generally allowed to supplement an argument with new cases that they did not raise in the district court." *True v. Utah Dep't of Transp.*, 2018 UT App 86, ¶ 41, 427 P.3d 338 (cleaned up).

owned 47% of the land in Hawaii and the federal and state governments owned 49% of the land. *Id.* To remedy the negative impacts of this concentrated land ownership on Hawaii's real estate market, including inflated land prices, the act "created a mechanism for condemning residential tracts and for transferring ownership of the condemned fees simple to existing lessees." *Id.* In finding Hawaii's act constitutional, the Court explained,

> What in its immediate aspect is only a private transaction may be raised by its class or character to a public affair. As the unique way titles were held in Hawaii skewed the land market, exercise of the power of eminent domain was justified. The Act advances its purposes without the State's taking actual possession of the land. In such cases, government does not itself have to use property to legitimate the taking; it is only the taking's purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause.

*Id.* at 244 (cleaned up).

¶25   The case before us is wholly different. Here, we are not dealing with a comprehensive statutory scheme where private beneficiaries were taking title to property to break up a "land oligopoly." *See id.* at 242. Instead, we are dealing with an entity seeking to install pipes for its sole benefit. The Court in *Midkiff* made clear that a "purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of the government and would thus be void." *Id.* at 245. Allowing WE Five to exercise eminent domain authority would be a "purely private taking" and "benefit a particular class of identifiable individuals," and this is not a permitted public use. *See id.* Additionally, *Midkiff* dealt with a specific, legislative scheme, not the general eminent domain power. Our legislature has not passed such a scheme here that would apply to WE Five. Therefore, we find *Midkiff* inapplicable.

¶26    Finally, we are also unpersuaded by WE Five's statement at oral argument that the act of installing pipes in the ground that might possibly be used by Sandy City or the Sewer District on some unknown future occasion would constitute public use as opposed to private use. We see no limiting principle to the position espoused by WE Five. If the court were to adopt WE Five's argument that the mere possibility of any potential future use by a local municipality or sewer district qualifies private condemnation as a public use, it would open eminent domain powers to unlimited use and possible (if not likely) abuse.

¶27    Thus, we conclude that the mere installation of pipes is not a public use under the Eminent Domain Statutes.

B.    The Person in Charge of Public Use

¶28    WE Five directs us to the use of the word "person" in section 78B-6-507 of the Eminent Domain Statutes, which provides that the plaintiff in the eminent domain complaint should be "the corporation, association, commission or *person* in charge of the public use for which the property is sought." (Emphasis added.) It argues that the legislature thus intended for private parties, like WE Five, to exercise eminent domain. We disagree with WE Five's reading of section 507.

¶29    In some cases, eminent domain authority is granted expressly by either Utah's constitution or the legislature. *See* Utah Const. art. XI, § 5 ("The power to be conferred upon the cities by this section shall include the following: . . . To furnish all local public services, to purchase, hire, construct, own, maintain and operate, or lease, public utilities local in extent and use; to acquire by condemnation, or otherwise, within or without the corporate limits, property necessary for any such purposes . . . ."); *see also* Utah Code § 17D-1-103(2) ("A special service district may: (a) exercise the power of eminent domain possessed by the county or municipality that creates the special service district . . . ."). In other instances, eminent domain authority can exist when an entity or individual condemns land for a public use they will

oversee. *See* Utah Code § 78B-6-501(2)(h) (stating that "telecommunications, electric light and electric power lines, sites for electric light and power plants, or sites for the transmission of broadcast signals from a station licensed by the Federal Communications Commission . . . and that provides emergency broadcast services" are public uses); *see also Williams v. Hyrum Gibbons & Sons Co.*, 602 P.2d 684, 686 (Utah 1979) (noting that "the legislature has delegated its power of eminent domain to public utilities for certain uses").

¶30    Though the word "person" as used in section 507 can apply to private entities, such a person must also be "in charge of the public use" to have eminent domain power. *See* Utah Code § 78B-6-507. Here, even assuming that the mere installation of the pipes alone qualified as a public use, WE Five would not be "in charge" of any public use as contemplated by the Eminent Domain Statutes.

¶31    In *Salt Lake City Corp. v. Evans Development Group, LLC*, 2016 UT 15, 369 P.3d 1263, our supreme court held that the Eminent Domain Statutes "require that it is the condemnor that must maintain ownership of the property and be in charge of the public use—not a third party." *Id.* ¶ 14. There, Salt Lake City entered into an agreement with Rocky Mountain Power where Salt Lake City would condemn a property on behalf of Rocky Mountain Power and then transfer it to Rocky Mountain Power to provide services. *Id.* ¶ 4. Our supreme court determined that Salt Lake City did not have the power to condemn the property in that instance, even though providing electricity to the public was a public use, because Rocky Mountain Power "would own the property and be in charge of the public use." *Id.* ¶ 14. The court emphasized the importance of the "in charge" requirement, explaining that the condemnor "must be in charge of the property and the use to which the property will be applied, so that if the condemnor fails to follow proper statutory procedures, the condemnee will have recourse against the condemnor." *Id.* ¶ 21.

¶32 This case is similar to *Evans*. Though WE Five would be the condemnor, it would not be the provider of the public use—water and sewer services to the WE Five property. Thus, WE Five would be a third party condemnor and the condemnees, Wild Country and the Lamberts, would not have recourse against WE Five if it did not follow the procedures outlined in the Eminent Domain Statutes. Sandy City or the Sewer District could have properly condemned the property because they would be operating "pipes for conducting water or sewage," which are valid public uses under the Eminent Domain Statutes, and they would be in charge of these uses. Utah Code § 78B-6-501(c)(ii). But here, in line with our supreme court's guidance in *Evans*, we cannot conclude that by installing pipes alone, WE Five would be "in charge of . . . the use to which the property will be applied." 2016 UT 15, ¶ 21.

¶33 At oral argument, WE Five pointed to *Berman v. Parker*, 348 U.S. 26 (1954), in support of its position. In *Berman*, the U.S. Supreme Court sought to determine the constitutionality of the District of Columbia Redevelopment Act of 1945. *Id.* at 28. Congress had determined there was a need to improve substandard housing and blighted areas that were "injurious to the public health, safety, morals, and welfare" and passed an act that created the District of Columbia Redevelopment Land Agency and granted the agency the power "to acquire and assemble, by eminent domain and otherwise, real property for the redevelopment of the blighted territory in the District of Columbia and the prevention, reduction, or elimination of blighting factors or causes of blight." *Id.* (cleaned up). The National Capital Planning Commission would create a land use plan, which would be subject to public comment. *Id.* Once adopted, the Commission would certify the plan to the Agency, which would then "acquire and assemble the real property" through eminent domain. *Id.* at 30. When it obtained the land, the Agency could then transfer it to other public agencies for public purposes or lease or sell the land to redevelopment companies, partnerships, or individuals, with "preference . . . to be given to private enterprise over public agencies." *Id.* The U.S Supreme

Court concluded the act was constitutional, stating that the "concept of the public welfare is broad and inclusive" and that "[o]nce an object is within the authority of Congress, the means by which it will be attained is also for Congress to determine," including private redevelopment. *Id.* at 33.

¶34    This case is factually different. Though the U.S. Supreme Court may have determined that such a scheme is proper under the federal constitution, our legislature has determined that for eminent domain to be proper in the State of Utah, the condemning entity must also be the one in charge of the public use. In other words, if an act similar to the District of Columbia Redevelopment Act was passed in Utah, the condemning entities would necessarily be the ones responsible for redeveloping parcels of land unless the act contained an exception to the contrary.

¶35    Therefore, because installing pipes is not a public use and WE Five would not be in charge of the public use of operating the water and sewer pipes, Wild Country's motion to dismiss should have been granted, and we thus reverse.

## II. Motion for Immediate Occupancy

¶36    During eminent domain proceedings, a plaintiff can file a motion for immediate occupancy, which allows the plaintiff to "(i) occupy the premises sought to be condemned pending the action, including appeal; and (ii) to do whatever work on the premises that is required." Utah Code § 78B-6-510(1)(a). Because we conclude that the Eminent Domain Statutes do not convey the right of eminent domain to WE Five and that the motion to dismiss should have been granted, whether the district court should have granted the motion for immediate occupancy is now moot. *See Behar v. Johnson*, 2024 UT App 129, ¶ 19, 557 P.3d 607 ("An issue on appeal is considered moot when the requested judicial relief cannot affect the rights of the litigants. . . . And once an issue is moot, we lack the power to address the underlying merits or issue what would amount to an advisory opinion." (cleaned up)); *Smith v. Kirkland*, 2017 UT App 16, ¶ 32, 392 P.3d

847 (holding that because the court reversed the district court's grant of summary judgment, review of a rule 60(b) motion was moot). We therefore do not address this issue.

CONCLUSION

¶37    The Eminent Domain Statutes do not confer upon WE Five the right to exercise eminent domain authority. Therefore, we reverse the district court's denial of Wild Country's motion to dismiss WE Five's eminent domain claim and remand the matter to the district court for dismissal of this claim and for such other proceedings as may now be appropriate.[8]

———————

8. WE Five's eminent domain claim against the Lamberts and WE Five's claim against both Wild County and the Lamberts for an easement of necessity remain pending before the district court. *See supra* notes 5, 6.