EASTERN OREGON LAND CO. v. WILLOW RIVER LAND & IRRIGATION CO.†

(Circuit Court of Appeals, Ninth Circuit. March 3, 1913.)

No. 2,073.

1. EMINENT DOMAIN (§ 29*)—IRRIGATION COMPANIES—RIGHT OF EMINENT DOMAIN.

L. O. L. § 6525, provides that the use of water of lakes and streams of the state "for general rental, sale and distribution" for the purposes of irrigation, etc., is a public use, and that "a use shall be deemed general within the purview of this act when the water appropriated shall be supplied to all persons whose lands lie adjacent to or within the reach of the line of the ditch or canal or flume in which said water is conveyed without discrimination other than priority of contract upon payment of charges therefor as long as there may be water to supply." Section 6526 gives to a corporation organized to make an appropriation of water for such general use the right to condemn lands for reservoirs, ditches, right of way, etc. *Held*, that the fact that a corporation which meets all the requirements of the statute also has lands of its own which it purposes to irrigate from its system does not deprive it of the right to exercise the power of eminent domain thereby conferred.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 76; Dec. Dig. § 29.*]

2. EMINENT DOMAIN (§ 29*)—IRRIGATION COMPANIES—RIGHT OF EMINENT DOMAIN.

Nor is such a corporation debarred from that right because it purposes, when all of its water shall have been sold, to turn its system over to an operating corporation, the shareholders of which are to be the owners of the water rights, one share to be issued for each acre for which the right is purchased.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 76; Dec. Dig. § 29.*]

3. EMINENT DOMAIN (§ 186*)—IRRIGATION COMPANIES—CONDEMNATION PROCEEDINGS—CONDITIONS PRECEDENT—OREGON STATUTE.

The failure of an irrigation company in Oregon, which instituted proceedings for the appropriation of water in 1908 to file a map with the county clerk showing the general route of its canal or ditch, as required

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing denied May 19, 1913.

by L. O. L. § 6529, then in force, was a defect in procedure which was cured by section 7 of the Water Code of February 24, 1909 (Laws 1909, p. 342; L. O. L. § 6595), which provides that "where appropriations of water heretofore attempted have been undertaken in good faith, and the work of construction or improvement thereunder has been in good faith commenced and diligently prosecuted, such appropriations shall not be set aside or avoided in proceedings under this act, because of any irregularity or insufficiency of the notice by law, or in the manner of posting, recording or publication thereof," where the condemnation proceedings were commenced after such act went into effect and there was no question of the good faith or diligence of the company.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 500–504; Dec. Dig. § 186.*]

4. EMINENT DOMAIN (§ 181*)—IRRIGATION COMPANIES—CONDEMNATION PROCEEDINGS—CONDITIONS PRECEDENT—OREGON STATUTE.

By the provisions of L. O. L. §§ 6528, 6529, requiring an irrigation company intending to appropriate water to post a notice containing "a general description of the course of said ditch or canal or flume," and to file for record a map "showing the general route of said ditch or canal or flume," it is not intended that the appropriator shall define the precise line of its ditch in either notice or map to sustain condemnation proceedings, when it is for the first time required to be definitely fixed, and it is sufficient if the line as so fixed follows substantially that described in the notice and shown by the map.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 488, 490–492; Dec. Dig. § 181.*]

5. EMINENT DOMAIN (§ 181*)—IRRIGATION COMPANIES—PROCEEDINGS FOR APPROPRIATION OF WATER—NOTICE.

Such a notice is not invalidated by a manifestly clerical error.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 488, 490–492; Dec. Dig. § 181.*]

Morrow, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Oregon; Charles E. Wolverton, Judge.

Condemnation proceedings by the Willow River Land & Irrigation Company against the Eastern Oregon Land Company. Judgment for petitioner, and defendant brings error. Affirmed.

Huntington & Wilson, Teal, Minor & Winfree, and W. A. Johnson, all of Portland, Or., for plaintiff in error.

Richards & Haga, of Boise, Idaho, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge. The parties herein will be designated as they were in the court below; the plaintiff in error here having been the defendant in the action. The action was brought by the plaintiff to condemn rights of way for canals, laterals, ditches, and siphon lines necessary for an extensive irrigation scheme over the lands of the defendant in Malheur county, in the state of Oregon. The several parcels so sought to be condemned comprised in the aggregate 67.3 acres. A jury trial was waived by stipulation of the parties, and the cause was heard before the Circuit Court. The court found in favor of the plaintiff on all issues involved, and a judgment

was entered condemning the lands to its use on the payment to the defendant of the sum of $2,375 and costs.

The issues raised by the pleadings involved two principal questions: First, whether the plaintiff was a corporation such as to be entitled to exercise the right of eminent domain; second, if it were such a corporation, whether prior to the commencement of the suit it had taken the steps which under the law it was required to take as preliminary to the exercise of that right. Upon these issues the trial court found for the plaintiff. In so far as the findings involve the decision of questions of fact, they are conclusive here, unless they are wholly unsupported by testimony.

The defendant, in support of its contention that the use to which the plaintiff proposes to devote the water is not a public use, cites the recent decision of the Supreme Court of California in Thayer v. California Development Co., 128 Pac. 21. In that case the court held that the right acquired in California by appropriation and diversion of water from a stream is private property, unless, after appropriation, there is an additional act of dedication to the public use, and that an appropriation notice which claimed water for the appropriator and others for the purpose of developing power and for the irrigation of land "in the New River country" was not sufficient to show that it was claimed for use by the public; that the Constitution of California (article 14, § 1), which provides:

"The use of all water now appropriated, or that may hereafter be appropriated, for sale, rental, or distribution, is hereby declared to be a public use, and subject to the regulation and control of the state, in the manner to be prescribed by law"

—does not mean that water taken for the irrigation of a fixed tract is appropriated for public use, but that it was intended to regulate the use of water appropriated and dedicated generally for sale and distribution among an indefinite number of users. Accordingly the court ruled that the defendant corporation could not be compelled by mandamus to furnish water to the plaintiff, who owned lands in the vicinity of the lands irrigated by the corporation, and incidentally the court remarked that it would follow as a matter of course that the corporation possessed no power of eminent domain. The decision in that case requires no comment here, further than to say that it construes a provision of the Constitution of California, and does not aid us in determining what is the law of Oregon. What constitutes a valid appropriation of water to beneficial uses is a question of local law.

[1] The act of February 18, 1891 (Laws 1891, p. 52, § 1; section 6525, Lord's Oregon Laws) provides:

"That the use of the water of the lakes and running streams of the state of Oregon, for general rental, sale or distribution, for purposes of irrigation and supplying water for household and domestic consumption, and watering live stock upon the dry lands of the state, is a public use, and the right to collect rates or compensation for such use of said water is a franchise. A use shall be deemed general within the purview of this act when the water apropriated shall be supplied to all persons whose lands lie adjacent to or within the reach of the line of the ditch or canal or flume in which said

water is conveyed, without discrimination other than priority of contract, upon payment of charges therefor, as long as there may be water to supply."

The second section (Lord's Oregon Laws, § 6526) gives to the corporation described in the first section the right to condemn lands for reservoirs, ditches, rights of way, etc. Upon the evidence in the case the court below found as follows:

"Plaintiff is engaged in the general sale of water for irrigation and domestic purposes, and has sold water rights in said irrigation system for approximately 2,400 acres to divers and sundry persons."

But it is said that the plaintiff should have been denied the right to condemn lands for reservoirs and rights of way, for the reason that it has not complied with the statute; that it is not supplying water to all persons whose lands lie adjacent to or within reach of the line of its canal without discrimination other than priority of contract, upon payment of charges therefor; that the water is not for general rental, sale, or distribution; that the plaintiff does not propose to supply the same to persons whose lands lie adjacent to or within the line of its ditch; that the finding of the court in that respect is not supported by the evidence, and that about 4,500 acres of land belonging to that corporation will be supplied with water by its system.

We think that the evidence fully sustains the findings of fact of the court below. The fact that the plaintiff will irrigate 4,500 acres of land which it owns, does not, in view of the other purposes it has in view, render it any the less a public service corporation. Walker v. Shasta Power Co., 160 Fed. 856, 87 C. C. A. 660, 19 L. R. A. (N. S.) 725; Van Dyke v. Midnight Sun Mining & Ditch Co., 177 Fed. 85, 100 C. C. A. 503; Matter of Niagara Falls & Whirlpool R. Co., 108 N. Y. 375, 15 N. E. 429; Lake Koen Nav. R. & I. Co. v. Klein, 63 Kan. 484, 65 Pac. 684; Cole v. County Commissioners, 78 Me. 532, 7 Atl. 397; State ex rel. Harlan v. Centralia, etc., Co., 42 Wash. 632, 85 Pac. 344, 7 L. R. A. (N. S.) 198; State ex rel. Shropshire v. Superior Court, 51 Wash. 386, 99 Pac. 3. The evidence shows, moreover, that the lands which were purchased by the corporation were not purchased to be used and farmed by it, but in order to create a market for its water by selling the land with water rights attached. The purpose of the purchase is fully explained in the testimony. The plaintiff had contracted to deliver to the Oregon Fruit Farmers' Company water at $55 an acre for 5,000 acres of land. It found it could not afford to furnish the water at so low a price. Said Mr. Hibbard:

"We should very much have preferred to have sold the water at a fair price than to hold the land, as it took some $200 an acre to buy this land, a bonus to these people who already owned it of just about twice what they had paid for it, the increased value owing to our improvements. I consider it would have been a loss to have sold water at $55 an acre, a loss of $50 in good round figures. It is going to cost us at least $100 or more."

The president, Mr. Wayman, testified:

"There are also about 45 water users who take water from this system. * * * The amount of lands for which water has been sold other than the

plaintiff is from 3,500 to 4,000 acres. * * * All the land of the plaintiff is for sale, and it has already sold some of it. * * * We anticipate that water will be supplied for irrigating eventually from 15,000 to 18,000 acres."

Mr. Brown, the secretary and treasurer of the corporation, testified:

"The intent of the company is to sell water for the lands under the canal as now constructed, just as rapidly as we can get customers for it. If it has water for more land than lies under the canal as now constructed, we will carry the water on down the valley for sale."

The assertion is made that the plaintiff has devised a scheme whereby it appropriates to itself, under the name of a water right, the entire value of the land to which the water is to be appropriated, whether the land is owned by itself or another. If this were true, it would be no ground for reversing the judgment. But such is not the evidence. The testimony is that the unimproved barren land in that region without water has but a nominal value of from $1.25 to $5 an acre; that lands which are "good tillable lands" are worth with the water $125 to $150 an acre; that the plaintiff is selling its lands, which without the water would be valueless, at $200 an acre on 16 annual payments; that, while the charge for water is $125 an acre, it is on the basis of 16 annual payments; that it would be sold for less for cash; and that it was offered to the defendant for cash at $90 an acre, although the actual cost thereof to the plaintiff was $100 per acre.

[2] But it is said that the plaintiff must be denied the right to condemn private property to its use, for the reason that it proposes, at some time hereafter, to turn its irrigation system over to an operating corporation, to be known as the Orchards Water Company, the stockholders of which are to be the purchasers of the water, each stockholder to have one share of stock in the operating company for each acre for which he shall have acquired the right to use the water; and cases are cited such as Barton v. Riverside Water Co., 155 Cal. 509, 101 Pac. 790, 23 L. R. A. (N. S.) 331, and Burr v. Maclay Rancho Water Co., 160 Cal. 268, 116 Pac. 715, in which it is held that a corporation engaged in procuring water for its stockholders and delivering it only to stockholders in proportion to their respective amounts of stock, to be used upon their respective tracts of land is not, under the laws of California, a public service corporation delivering water for a public use.

The same might perhaps be said to be true of corporations formed under the Oregon act of 1891 and the amendments thereto. But that proposition is not involved in the present case. In the first place, the Orchards Water Company is not a corporation formed for the purpose of procuring water, nor it is here seeking to exercise the right of eminent domain. It is not even before the court, and it is not proposed to transfer the system to that company until after all the water which the system is capable of furnishing shall have been sold, which it is testified will be "four or five" years hence. In the second place, the future transfer of the system by the plaintiff to an operating corpora-

tion, the shareholders of which are to be the owners of the water rights, will not absolve either corporation from any obligation which is now imposed upon it to observe the laws of the state of Oregon. The use of its water so long as either corporation shall have water to supply to others will still be a general use, and it will be required to supply such waters to all persons whose lands lie adjacent to or within reach of the line of the ditch or canal, without discrimination other than priority of contracts, upon payment of the charges. So far as the record shows, no landowner and no purchaser of water has ever objected to the proposed transfer. Doubtless all parties interested regard it as an advantageous scheme, a scheme which is in line with the ultimate purpose of the similar projects of the United States for the irrigation of arid lands. All the information which the record gives us of the Orchards Water Company is that it is a co-operative corporation, and "not a corporation for profit," and that it is formed on the theory that it affords a desirable and satisfactory plan by which the purchasers of the water may have the management and control of the system in their own hands.

Can any sound reason be suggested why a corporation formed under the laws of the state of Oregon for the appropriation of water for general irrigation purposes, after it has built its reservoirs, acquired its right of way, completed its system, and supplied all persons with water whose lands lie adjacent to or within reach of its canal, without discrimination other than priority of contract, so long as there may be water to supply, may not after it has done all of these things, and exhausted its capacity to supply water, turn over to an operating company, to be composed of the users of the water, with their consent, the system and the operation, maintenance, and care of the same? In Mutual Irrigation Co. v. Baker City, 58 Or. 306, 328, 113 Pac. 16, the court said:

"Though plaintiff furnishes water generally for irrigation only when there is a surplus in its ditches after supplying the needs of its stockholders, it is, in our opinion, a corporation impressed with a public character, and holds its property subject to an exercise of the police power of a state to a greater degree than a private person. It would be improper to conclude, because a corporation, for a consideration, provides the means of communication, or furnishes transportation, or supplies heat, light, power, or water to its stockholders only, that it is not engaged in performing a public service."

Counsel for the plaintiff present a forcible argument in support of the proposition that in 1909 the Legislature of Oregon adopted a new act, complete in itself, covering the entire subject of water rights and water appropriations, and repealing by implication all other laws on the subject, and thereby gave to any corporation organized for the purpose of conducting water for irrigation purposes the right to condemn rights of way therefor. The act was enacted on February 23, 1909 (Laws 1909, p. 133). It declares (section 6838, Lord's Oregon Laws) that a corporation organized for the construction of any ditch or flume for the conduct of water for irrigation or domestic purposes shall have the right to enter upon any land within the termini thereof or elsewhere for the purpose of examining, locating, surveying

lines, etc.; and section 6839 provides that any corporation mentioned in the preceding section may appropriate so much of said land as may be necessary for the line of such ditch or flume, not exceeding 200 feet in width, and the same section further provides that such corporation shall have the right to condemn lands for the sites of reservoirs for storing water and for rights of way for feeders for carrying water to such reservoirs, and for ditches, canals, flumes, and pipe lines carrying the same away. This act is foreshadowed by the act of February 25, 1907 (Laws 1907, p. 289), which provides that the use of the water of the lakes and running streams of the state of Oregon, for the purpose of developing the mineral resources of the state, is declared to be a public beneficial use, and a public necessity. The Legislatures of several of the states in the arid regions have made the individual use of water for irrigation purposes a public use, and such laws have been sustained by the courts. In Ellinghouse v. Taylor, 19 Mont. 462, 48 Pac. 757, the court said:

"What real distinction is there, so far as the term 'public use' is concerned, between the benefit that results to a state from the reclamation by artificial irrigation of 160 acres of agricultural land owned by one or two persons and the reclamation by the same means of thousands of acres owned by many different persons living together in one subdivision of the state. We do not think there is any in principle. The reclamation of one small field by means of artificial irrigation promotes development and adds to the taxable wealth of the state, as well as the reclamation by the same means of a number of fields."

Again, the court said:

"Persons have been allowed the right of eminent domain, on the theory of a public use, in the construction of dams for the operation of grist and sawmills, in the reclamation of swamp lands, and in other similar instances that might be enumerated, where the public had no direct interest in these operations, whose main end was mere private gain, and where the benefit to the people at large could result indirectly and incidentally only from the increase of wealth and the development of natural resources."

It is asserted by the plaintiff, and it is not denied, that the Oregon act of 1909 was adopted from the law of Utah, which in 1904 had been construed by the highest court of that state in Nash v. Clark, 27 Utah, 158, 75 Pac. 371, 1 L. R. A. (N. S.) 208, 101 Am. St. Rep. 953, 1 Ann. Cas. 300. In that case the court held that the taking of property for the purpose of obtaining water for the irrigation of a farm and to render the same productive is a taking for a public use, and hence the owner of a farm may condemn a right of way through another's ditch for the purpose of carrying the water to his land for irrigation. The judgment in that case was affirmed by the Supreme Court in Clark v. Nash, 198 U. S. 361, 25 Sup. Ct. 676, 49 L. Ed. 1085, 4 Ann. Cas. 1171. The court, in view of the particular facts of the case, said:

"We are of opinion that the use is a public one, although the taking of the right of way is for the purpose simply of thereby obtaining the water for an individual, where it is absolutely necessary to enable him to make any use whatever of his land, and which will be valuable and fertile only if water can be obtained."

The act of 1909 above quoted has not been construed by any decision of the Supreme Court of the state of Oregon, and in the present case it is not necessary to consider whether, after its date, the rights of the parties hereto are ruled by that act, or by the prior act of 1891, for the reason that the plaintiff has clearly brought itself within all the requirements of either act, and it is a corporation authorized to condemn private property for the uses specified in its articles of incorporation.

[3] Did the plaintiff corporation, prior to commencing the action, take the necessary steps to acquire the water right, and to entitle it to condemn the property described in the complaint? At the time when the plaintiff initiated its proceedings to appropriate water for general rental, sale, and distribution for purposes of irrigation, which was in April, 1908, the statute which regulated such proceedings was that portion of the act of February 18, 1891, which is carried into Lord's Oregon Laws as sections 6528 and 6529. The first section requires that the corporation "shall post in a conspicuous place" at the point of diversion "a notice in writing, containing a statement of the name of the ditch or canal or flume, and of the owner thereof, the point at which its headgate is proposed to be constructed, a general description of the course of said ditch or canal or flume, the size of the ditch or canal or flume in width and depth, the number of cubic inches of water by miner's measurement, under a six inch pressure, intended to be appropriated, and the number of reservoirs" available; and the second section requires that, within 10 days from posting the notice, the corporation shall file for record in the office of the county clerk a similar notice "and at the same time shall file a map showing the general route of said ditch or canal or flume."

It is said that the plaintiff failed to comply with this law, in that it omitted to file with the county clerk the map which is required by section 6529. In answer to this it is sufficient to point to the fact that before the present action was commenced the "Water Code" of February 24, 1909 (Laws 1909, p. 319), had gone into effect. That act is entitled:

"An act providing a system for the regulation, control, distribution, use and right to the use of water, and for the determination of existing rights thereto," etc.

Section 7 of that act (section 6595, Lord's Oregon Laws) provides:

"Where appropriations of water heretofore attempted have been undertaken in good faith, and the work of construction or improvement thereunder has been in good faith commenced and diligently prosecuted, such appropriations shall not be set aside or avoided, in proceedings under this act, because of any irregularity or insufficiency of the notice by law, or in the manner of posting, recording, or publication thereof."

That act was intended to, and it does, cure all irregularities and informalities in proceedings taken to acquire appropriations of water under the previous laws, provided that the appropriations were undertaken in good faith, and construction in good faith had been commenced and diligently prosecuted. No question is here made of the good faith of the appropriation, or of the diligent prosecu-

tion of the work. It is not disputed that, aside from the expenditure for the purchase of land, the plaintiff has expended $1,200,000 on the irrigation system.

[4] Without merit, also, is the contention that the plaintiff should be denied the right to condemn the right of way described in the complaint, for the reason that the route thereof varies from that which is described in the notice of April 7, 1908. It is not the intention of the law that the appropriator, when it resorts to condemnation proceedings, shall be held to the exact line of the route described in its notice, or in the map of its general route. The law of 1891 provides that the notice shall contain "a general description of the course of said ditch or canal or flume," and further provides that a map shall be filed "showing the general route." The statute, therefore, does not require that the corporation shall, in its appropriation notice, fix upon a precise line, from which it shall not thereafter deviate in the slightest degree. The very language of the statute shows that the law is complied with if the notice and map contain no more than a general description. The notice in this case complies with the statute. It gave what it declared to be the "general courses and direction." Having given such a general description of the course of its ditch, a corporation, when it comes into court in a condemnation suit for its right of way, is required for the first time to define the definite line of its ditch. That was done in the present case, and the defendant can claim no prejudice to it from the fact that the description in the notice was but the general description which is required by the act.

The evidence in the case shows that the line described in the complaint followed substantially the general route described in the notice, and that the deviations are not considerable. Such is the uncontradicted testimony of Collins, the engineer, who said in substance that the notice was posted at a point 200 feet northeast from the present outlet or headgate. He testified that there was some deviation, owing to a change or two of grade, but that in general the line for which the right of way was sought to be condemned follows the original line as it was located; that he saw the survey stakes of the preliminary survey, and that the line of definite location coincides with and follows it in places; that the canyon through which the canal passes for the first 4 or 5 miles varies from 200 feet to 500 feet on the bottom, and that the canal is located on the west side of the canyon. He testified that, while the notice provides that the canal shall run from the headgate through section 2, it does not run through section 2, but that it runs less than 500 feet therefrom; that the canyon runs through sections 2 and 3.

"The ditch does not run through section 11. It runs a distance of a few hundred feet from section 11, probably 500 feet. The ditch does not run through section 13. It runs about 500 feet or 600 feet of section 14."

By clerical mistake the notice says that the headgate to the upper reservoir is in the southwest quarter of the northwest quarter of section 27, when it should have said the southwest quarter of the

southwest quarter of that section. That this is plainly a clerical error, as any one on the ground could see, is shown by Plaintiff's Exhibit 6, a map which shows that the only portion of section 27 crossed or touched by the creek is the southwest quarter of the southwest quarter, and that the southwest quarter of the northwest quarter of that section is half a mile away from the creek. As was said by Judge Ross in Osgood v. Water & Mining Co., 56 Cal. 571, 579:

"By all the authorities, the notices are to be liberally construed."

In Beckwith v. Sheldon, 154 Cal. 393, 97 Pac. 867, it was held that two notices, one of which was posted 200 feet distant from the place where another notice had been posted, both being intended for an extensive irrigation system, were posted substantially in the same place.

[5] The objection that the notice was defective for the misnomer of the appropriator is too technical and trivial to require extended discussion. It was passed by the court below as undeserving of attention. The notice begins by stating that the corporation, "the Willow River Land & Irrigation Company, has this day located," etc. Below, by clerical inadvertence, the word "River" is omitted from the corporate name of the "owner" of the water right, and the same clerical error is found in the signature to the notice by D. M. Brogan, the president. But in the certificate, which Brogan as president attached thereto, he declared that the attached notice "is a true copy of the notice of appropriation posted on behalf of the Willow River Land & Irrigation Company," and that certificate bears the signature of Brogan as the president of the "Willow River Land & Irrigation Company." The notice itself clearly shows by what corporation it was given, and it is identified by the amended complaint as the notice under which the plaintiff claimed its rights.

The plaintiff is engaged in constructing a large and comprehensive system to utilize waste waters of the state in the irrigation and reclamation of from 15,000 to 18,000 acres of arid and otherwise useless lands. In the development of its system it has expended large sums of money. It has sold to settlers water rights for the irrigation of more than 3,500 acres. It is the policy of the state, as expressed in its statute and the decisions of its courts, to encourage and favor such schemes of great public utility, and the plaintiff's project should not be stayed or defeated upon purely technical and unsubstantial objections such as are here presented.

We find no error. The judgment is affirmed.

MORROW, Circuit Judge (dissenting). I am of the opinion that the plaintiff is not a public service corporation and is not engaged in delivering water for public use. This opinion is based upon the limitations contained in the act of February 18, 1891 (Laws of Oregon, 1891, p. 52), as amended in 1899 (Laws 1899, p. 201), 1901 (Laws 1901, p. 136), 1905 (Laws 1905, p. 204), and 1909 (Laws 1909, p. 132), codified in Lord's Oregon Laws as sections 6525 to 6550. The act pro-

vides that a corporation organized for the construction and maintenance of a ditch or canal or flume for general irrigation purposes, or for supplying water for household and domestic use, and for watering live stock upon dry lands, may appropriate and divert water from its natural bed or channel and condemn rights of way for its ditch, canal, or flume, and may condemn rights of riparian proprietors upon the lake or stream from which such appropriation is made upon complying with the terms of the act.

The use of the waters of the lakes and running streams of the state for general rental, sale, or distribution for the purposes mentioned in the act is declared by section 1 (Lord's Oregon Laws, § 6525) to be a public use, and the right to collect rates or compensation for such use of said water is declared to be a franchise. It is provided further that a use shall be deemed general, within the purview of the act, when the water appropriated shall be supplied to all persons whose lands lie adjacent to or within the reach of the line of the ditch, canal, or flume in which said water is conveyed, without discrimination, other than priority of contract. In Umatilla Irrigation Co. v. Barnhart, 22 Or. 389, 30 Pac. 37, the Supreme Court of Oregon was called upon to construe this act, and held, among other things, that:

"It is an act the execution of which must be closely scrutinized by the courts, and all of its provisions construed strictly. Whoever claims anything by virtue of it must bring himself clearly within its terms."

It is contended by the defendant that the plaintiff is not a corporation organized for the construction and maintenance of a ditch or canal or flume for general irrigation purposes; that the water to be diverted by the plaintiff is not for general rental, sale, or distribution; that the plaintiff does not propose to supply the same to all persons whose lands lie adjacent to or within the reach of the line of the ditch, canal, or flume with which such water is conveyed, without discrimination other than priority of contract; and that the finding of the court in this respect is not supported by the evidence.

The objection makes it necessary to inquire into the purpose of the plaintiff, as declared in its article of incorporation, and as disclosed by the evidence in the case. The plaintiff was organized as the Willow River Land & Irrigation Company on the 28th day of March, 1908. It declared in its articles of incorporation that the objects for which the company was formed, and the enterprises, business, pursuit, and occupation in which the corporation proposed to engage, were among others the following:

"To build, establish, and construct, and, when established, to maintain and operate. dams, reservoir sites, irrigation ditches, channels, and flumes, together with laterals running therefrom, for the purpose of irrigating lands, and for the purpose of bringing under cultivation desert and unproductive land; to acquire a fee simple title to lands, or a lesser interest therein, and to water and irrigate same, and to lease, sell, or dispose of same, either in whole or in part; to operate and construct irrigation system or systems, and the business of furnishing water for irrigation purposes to others under contract or sale, or in any other manner whatsoever; to obtain, by purchase, lease, location, or otherwise, water rights and privileges and irrigation rights and privileges, and to maintain and operate a general system of irrigating lands for itself or for others, and to engage in the general business of de-

veloping and cultivating lands and handling the produce therefrom for itself or for others; to construct, maintain, improve, control, and superintend canals, reservoirs, water courses, ditches, flumes, laterals, canneries, curing and drying houses, water powers, and hydraulic and electrical works, and to engage in any other lawful enterprise, business, pursuit, or occupation which may seem conducive to any of the objects of the company, and to contribute to or otherwise take part in any such operation; to clear, manage, farm, cultivate, irrigate, plant, or otherwise work, use, or improve any of the land which the company may own, or in which it may be interested, either for itself or for others."

The evidence as to the purpose and business of the corporation introduced upon the trial of the case is more specific, and enters more in detail concerning its scope and character.

W. M. Wyman, the president of the plaintiff corporation, was called as a witness on behalf of the plaintiff, and, referring to the canals then being constructed for its irrigation system, said:

"Water will be supplied from that [plaintiff's] system for about 4,500 acres of land belonging to the plaintiff. There are also about 45 water users to take water from this system. The plaintiff owns over 5,000 acres of land that can be irrigated from the system. The amount of land for which water has been sold to others than the plaintiff is from 3,500 to 4,000 acres. * * * The plaintiff's canal was located as high up as possible, in order to cover the lands which the plaintiff owned at the time the canal was built; but I don't consider it was wisely located for general irrigation in the valley. It was located on the best location for a ditch to convey water to the lands which the plaintiff desired to irrigate, the location upon which this canal could be most cheaply built to cover these lands, the lands which the plaintiff owned at the time of the commencement of these proceedings. * * * Plaintiff's irrigation system was constructed to irrigate the extreme upper end of Willow Creek valley. * * * A large part of the lands of the defendant in section 15 and section 31 are susceptible of irrigation, and with the water supply are good agricultural lands. * * * The plaintiff is selling lands up there with the water right. It is offering lands with the water right at $200 an acre on 16 annual payments, $25 payment down, $5 an acre per year for the first 5 years, $10 an acre per year for the second 5 years, and $20 an acre per year for the third five years. This takes two acre feet of water. The purchasers become shareholders in the system when it is completed and turned over to them, and do not have to pay any more for the water thereafter, but do have to pay their regular assessment charges for rental. The plaintiff is ready to enter into contracts to furnish water for lands owned by persons other than the plaintiff. It undertakes to furnish water for lands of others at $125 an acre on 15 years' time, 16 annual payments. * * * The plaintiff estimates that it will require in the neighborhood of 30,000 acre feet to irrigate the lands which it owns, and which others own and which it contemplates to irrigate. * * * When a party buys a water right from the plaintiff, he acquires a particular share with every acre in the completed system. It is a co-operative plan, and he becomes an owner in the plant. Every one who owns an acre of lands owns a share in the system."

George F. Brown, plaintiff's secretary and treasurer, was called as a witness on behalf of the plaintiff, and testified that:

"The purchaser of the water becomes a stockholder in the operating company to which the system will be turned over upon completion, receiving one share of stock for each acre of land for which he purchases water, and when all the lands under the system have purchased water rights the system will belong to the owners of the land. Until the system has been turned over to the purchasers, the maintenance charge is $1 a year per acre. After the system has been turned over, the maintenance charge is whatever may be fixed by the stockholders or the landowners, which is the same thing, and

not by the Willow River Land & Irrigation Company. * * * Plaintiff has offered for sale and desires to sell out of its irrigation system water for 15,-000 acres. It is not the policy of the plaintiff corporation to farm its lands or to use the water for its own use. Its plan and policy is to sell these lands as rapidly as possible, sell them with the water right as rapidly as possible, that they may be developed and become productive. The intention of the company in buying these lands is to attach the water to them and sell the water with the lands, in that way find a market for the water. * * * The plaintiff in making water contracts requires an applicant for water to buy one share of stock in the Orchards Water Company, which is the company to which the plaintiff system is to be turned over when completed, for each acre of land it desires to irrigate. The Orchards Water Company is the water company which is to own this irrigation system. The plaintiff sells the water right to everybody at the same rate. It does not sell this water right to parties if they apply for it and do not desire to become interested in the water company. The plaintiff company has adopted this plan, and has assumed that it would be a fairly satisfactory plan, and a desirable plan for the purchasers of water. It is the present intention of the plaintiff to confine its sale of water to parties who become stockholders in the holding company. * * * The Orchards Company is what I would call an operating company, and is a company incorporated for the purpose of taking over the irrigating system, when completed, and of operating it; stockholders of the Orchards Water Company being the owners, the purchasers of water from the Willow River Company. When the system is turned over to that company, there will be no stock in that company which is not owned by water users. Each water user will have a share of stock in that company for each acre of water or for water for each acre of land which he owns, and each share of stock represents sufficient water for irrigation of one acre. It is not a corporation for profit. It is a co-operative corporation, having 50.000 shares, and no stock in that company is sold except to landowners, and not sold to landowners except as they buy water. They do not buy water independent of the stock. The stock represents a water right. Each stockholder gets his proportional part of the water in the system. The Orchards Water Company is not operating the system at this time. It is operated by the plaintiff, and will be until the system is completed and turned over. * * * Should the defendant want to irrigate, its lands, it could get water from the plaintiff by purchasing it. It could get a share of stock in the operating company for each acre of land for which it purchased water."

The form of the water contract referred to by this witness was introduced in evidence. The material portion of the contract was as follows:

"That, for the consideration and upon the terms hereinafter stated, the company hereby sells and the purchaser hereby purchases certificate No. ——— for one share of the capital stock of the Orchards Water Company, a corporation organized under the laws of the state of Oregon, for the purpose of acquiring, maintaining, and operating an irrigation system for the irrigation of the lands above described and other lands; said irrigation system being more particularly described in the contract for the construction thereof bearing date the 19th day of March, 1910, between the said Willow River Land & Irrigation Company and the said Orchards Water Company, to which reference is hereby made. That each share of stock in said Orchards Water Company hereby purchased by the purchaser represents a storage and carrying capacity in said irrigation system sufficient to deliver from April 1st to November 1st in each year two (2) acre feet of water for the irrigation of the above-described land, and said shares of stock and water shall be inseparably appurtenant to said land."

John D. Hibbard was called as a witness for the plaintiff. He testified that he was president of the North American Securities Company of Chicago, and that this company was practically the owner of the

plaintiff—owned a large part of the stock. The original loans to the plaintiff were made by the Farwell Trust Company. The North American Securities Company is a subsidiary of the Farwell Trust Company; the stockholders and directors are the same, and the former took over the contracts of the latter with the plaintiff. The witness testified as follows:

"I had something to do with the purchase by the plaintiff of a large tract of land now under its system. There was presumably a contract which could be enforced on the part of the Oregon Fruit Farms Company, a land-holding and development company in the valley, with the Willow River Land & Irrigation Company, under which the previous management had contracted to deliver to the Oregon Fruit Farms Company water at $55 an acre for 5,000 acres, which was made at the time of the original cost of this whole project, as represented by the Farwell Trust Company to us, was supposed to be $500,000 at an outside amount, and at that amount $55 an acre was presumed to be a fair and reasonable price for water. Under the exigencies of construction which always arise in every irrigation project that I ever heard anything about, litigation in buying up claims, lining four miles of the canal flume that would not hold water when it was built according to the original plans, on account of erroneous estimates, bad engineering advice, possibly—when we started in we found that we could not sell water at $55 an acre and come out whole. This contract for 5,000 acres, which took a very large percentage of the entire amount of water at our disposal at $55 an acre, was a menace, and to dispose of the $55 water contract we bought 5,000 acres of land. We should have very much preferred to have sold the water at a fair price than to hold the land, as it took some $200,000 to buy this land, and a bonus to these people who originally owned it of just about twice what they themselves had paid for it—increased value owing to our improvements. I consider it would have been a loss to have sold water at $55 an acre—loss of $50 an acre in round figures. It is going to cost us at least $100 or more. By buying the land, we own the land and the contract, and canceled the contract."

It appears from this evidence that the plaintiff is engaged in organizing a mutual water company, and that its entire system of irrigation is to be turned over to this mutual company when all the water rights have been disposed of. The water diverted by the plaintiff is to be delivered to stockholders of this company, and to none others. This in law is not a public service corporation, but a corporation engaged in a private enterprise. Wiel in his Water Rights in the Western States has this to say of such companies, in section 1266:

"Mutual companies are usually such that shares of stock represent rights to specific quantities of water, and the stockholder's right to a supply rests upon his stock, and not upon his status as a member of the public; the company being formed to supply water to its stockholders only. * * * Because of this extensive prevalence of mutual companies in practice, it is very important to note that, being in private service only, they are not subject to the public control which obtains as to public service companies. The board of supervisors or other public body has no power to fix the rates or charges of mutual companies. Nor can a mutual company be forced to deliver water to others than its stockholders."

The author quotes from Barton v. Riverside Co., 155 Cal. 509, 101 Pac. 790, 23 L. R. A. (N. S.) 331, concerning a similar organization in California, as follows:

" 'This company is not, strictly speaking, a public service corporation delivering water to a public use. It is engaged in procuring 350 inches of water for its stockholders, and delivering it only to stockholders in propor-

tion to their respective amounts of stock, for use on their respective tracts of land.' A mutual company (if a corporation) must obey the laws of the state relating to the internal workings of corporations, but otherwise its conduct toward its members is a purely private matter."

In the recent case of Burr v. Maclay Rancho Water Co., 160 Cal. 268, 280, 116 Pac. 715, 721 (Ann. Cas. 1913A, 940), the Supreme Court of California has reaffirmed the doctrine of Barton v. Riverside Co. in language applicable to this case:

"The water taken by the defendants to supply the needs of the interveners is not taken for public use. It is not offered to the public generally, or to all who may want it within a certain territory. It is taken solely to fulfill the private contractual obligations of the defendants to deliver water to certain lots, which it has sold with a water right. This is a private use. Hildreth v. Montecito Co., 139 Cal. 29, 72 Pac. 395; Barton v. Riverside W. Co., 155 Cal. 518, 101 Pac. 790, 23 L. R. A. (N. S.) 331; Gilmer v. Lime Point, 18 Cal. 252."

See, also, Garrison v. North Pasadena Land & Water Co. (Cal.) 124 Pac. 1009.

It appears to me clear that under the act of February 18, 1891, plaintiff was not authorized to maintain this suit for the reason that it is not a corporation organized for the construction and maintenance of a ditch, canal, or flume for general irrigation purposes. The water to be diverted by the plaintiff is not for general rental, sale, or distribution, and the plaintiff does not propose to supply the same to all persons whose lands lie adjacent to or within the reach of the line of the ditch, canal, or flume with which said water is conveyed, without discrimination other than priority of contract. On the contrary, water is to be diverted for the purpose of supplying plaintiff's irrigation project, and for the beneficial use of the stockholders of the corporation to which plaintiff's entire system is to be transferred. It is true it is stated in the articles of incorporation that it is plaintiff's purpose "to maintain and operate a general system of irrigation of lands for itself and for others." How it will irrigate for others is described fully in the testimony. The plaintiff's witness W. M. Wayman, who, as before stated, was plaintiff's president, testified:

"The plaintiff is ready to enter into contracts to furnish water for lands owned by persons other than the plaintiff. It undertakes to furnish water for lands of others at $125 an acre on 15 years' time, 16 annual payments. This is on graduated payments, $2.50 an acre for a period of years, then increasing it so the larger payments will come during the latter end. * * * The purchasers become shareholders in the system when it is completed and turned over to them, and do not have to pay any more for the water thereafter, but do have to pay their regular assessment charges for rentals."

In other words, the plaintiff offers to landowners a water right on the payment of a sum which it fixes arbitrarily at $125 per acre; but the purchaser in addition must pay the regular assessment charges as a rental for the use of the water. Referring to the defendant's land, the witness testified that the defendant's land in section 15, township 15 south, range 42 east, and section 31, township 15 south, range 43 east, was worth $125 per acre with the water right; but he did not consider the land worth anything without the water right.

The plaintiff's project, then, is to sell to other landowners water rights at $125 per acre, which, when purchased, will make the land worth $125 per acre. In other words, it has devised a scheme whereby it appropriates to itself under the name of a water right the entire value of the land for which the water is appropriated, whether the land is owned by itself or another.

There is, however, a qualification to this selling price of a water right. The witness testified that the charge of $125 per acre is upon the payment of that sum in 16 annual payments, "which," he says, "is different from a cash basis. If any one should want to buy water, and would come up with the cash, it would receive consideration."

Walter S. Martin, the president of the defendant company, testified that he had a conference with the officers and representatives of the plaintiff company at Salt Lake concerning the plaintiff's irrigation project. The upshot of the conference was that Martin was asked if his company would buy water for its land at the rate of (he thinks) $90 or $95 per acre. Martin thought the price was too high; but, whether it was high or not, it was a discrimination in favor of the defendant, based upon consideration other than that of priority of contract. Mr. Martin insisted that whatever offer was made to him should include also the land of the farmers on Willow creek who were members of the Water Users' Association. To this proposition plaintiff objected, and no agreement was reached.

In the recent case of Imperial Water Co. v. Holabird, 197 Fed. 4, 116 C. C. A. 526, we had occasion to consider certain features of the organization of the California Development Company and its charge for a water right under the irrigation laws of California. In that case the settler on public land within the project was compelled to take water from the company at a fixed and arbitrary price for a water right, which in that case was fixed at $25 per acre, and following the doctrine of previous cases in this court we there held that an irrigation company appropriating water for sale under the statute had no authority to make private contracts for so-called perpetual water rights, and that such contracts were void.

In Thayer v. California Development Co., 128 Pac. 21, this same irrigation company was before the Supreme Court of the state of California. The scheme had been organized upon substantially the same plan as that of the plaintiff in the present case. It included an irrigation company, which had appropriated water from the Colorado river to irrigate a certain designated territory, and subsidiary corporations for the purchase of land in that territory, with water rights to be attached to the land purchased from the irrigation company. The question was whether the water appropriated from the Colorado river for distribution in accordance with this scheme was dedicated to a public use. The Supreme Court of California held that it was not, and that neither the irrigation company nor any of its subsidiary water companies possessed the power of eminent domain. I see no reason why the law of the California case is not applicable to the present case.

But, assuming that the plaintiff is entitled under the laws of Oregon to condemn private property for a private use, there is still further objection to these proceedings that the appropriation of water by the plaintiff was not in accordance with the requirements of the statute. Section 4 of the act provides:

"When a point of diversion shall have been selected, such corporation shall post in a conspicuous place thereat a notice in writing containing a statement of the name of the ditch or canal or flume and of the owner thereof, the point at which its headgate is proposed to be constructed, a general description of the course of said ditch or canal or flume, the size of the ditch or canal or flume, in width and depth, the number of cubic inches of water by miner's measurement under a six-inch pressure intended to be appropriated, and the number of reservoirs, if any."

It appears from the evidence that no notice of appropriation of water was posted by the plaintiff at the point of diversion, as required by the statute, and as alleged in the amended complaint. A notice was posted, signed by the Willow Land & Irrigation Company, and not by the plaintiff, the Willow River Land & Irrigation Company; and in the body of the notice it was stated that the canal conveying the appropriated water should be known as the Mountain Side canal, and that the name of the owner was the Willow Land & Irrigation Company, and not the Willow River Land & Irrigation Company. It is not alleged in the amended complaint that this difference in name in the notice was a clerical mistake, or a mistake at all, or that the name of the plaintiff was intended to be signed to the notice and stated in the body thereof, instead of the name of the Willow Land & Irrigation Company. For all that appears in the record, no notice of appropriation of water was ever posted by the plaintiff, and the proposed canal was not owned or to be owned by the plaintiff, and there is nothing in the record to show that the Willow Land & Irrigation Company is in fact the Willow River Land & Irrigation Company. Furthermore, the notice states that there were to be two reservoirs to be used for storage purposes in connection with the operation of the canal. The headgate of the upper reservoir was to be located in the southwest quarter of the northwest quarter of section 27, township 14 south, range 42 east. The headgate of the lower reservoir was to be located in the northeast quarter of the southwest quarter of section 2, township 15 south, range 42 east. It appears from the evidence that the site of the upper reservoir was located on the southwest quarter of the southwest quarter, instead of the southwest quarter of the northwest quarter, of section 27, township 14 south, range 42 east. This section is claimed by the defendant, but the plaintiff does not seek to condemn any part of it in these proceedings.

It is certified that the notice of location and appropriation was posted in a conspicuous place at the point of diversion, to wit, at the point of the headgate of the reservoir situated in the southwest quarter of the northwest quarter of section 27, township 14 south, range 42 east; but as no reservoir was located on that particular subdivision of the section, and the river did not touch it, no notice was in fact posted at the point of diversion, and, as no reservoir was

in fact located on section 2, township 15 south, range 42 east, there was no location of a point of diversion at any place where water could be taken from Willow creek. In the notice the general course and direction of the canal was stated to be from said headgate in a southwesterly direction through section 2, township 15 south, range 42 east; but no reservoir or headgate was in fact located in section 2, and how or in what manner or through what land the canal was to be carried from the supposed point of diversion in section 27, township 14 south, range 42 east, in a southwesterly direction for the distance of more than a mile to section 2, township 15 south, range 42 east, was not stated in the notice. But the evidence and the map showing the project of the Willow River Land & Irrigation Company, introduced in evidence upon the trial of this case, shows that the line of the canal as projected passes through section 34, township 14 south, range 42 east, not mentioned in the notice, thence south through section 3, township 15 south, range 42 east, land owned by the defendant, but not mentioned in the notice, instead of through section 2, township 15 south, range 42 east, as stated in the notice; the line of the canal at this point passing some distance to the west of the line stated in the notice. The notice also stated that the general course and direction of the canal from the headgate in section 2 was to be in a southwesterly direction through sections 11 and 14. The evidence does not show that the canal passes through sections 11 and 14, and in fact does not, but does pass through other sections to the west and south, among others, through sections 21 and 31 in township 15 south, range 42 east, lands belonging to the defendant, but not mentioned in the notice.

The substantial objection to these differences between the posted and recorded notice and the line of the canal as actually projected and shown by the map introduced in evidence is the fact that the canal as projected passes through lands of the defendant in sections 3, 21, and 31, in township 15 south, range 42 east, concerning which no notice was ever posted or given, and this suit is to condemn lands belonging to the defendant concerning which no proceedings have ever been taken as required by the statute.

Section 5 of the act of 1891 required further that:

"Within ten days from the date of the posting of such notice [notice required by section 4] such corporation shall file for record in the office of the county clerk or recorder of conveyances, as the case may be, of the county in which said ditch or canal or flume, distributing ditches, reservoirs and feeders, are situated, a similar notice, and at the same time shall file a map showing the general route of said ditch or canal or flume. * * *"

A notice purporting to be a notice similar to the posted notice was filed with the county clerk of Malheur county, and a certified copy of this record was introduced in evidence over the objection of the defendant that the paper was incompetent and immaterial, because the instrument purported to be filed by a corporation other than the plaintiff (referring to the difference in name heretofore stated), and because the instrument was defective and inaccurate in the particulars heretofore mentioned and others of the same character. There was no

evidence that at the time the notice was filed with the clerk of the county, or at any time, a map had been filed with the clerk showing the general route of the canal, ditch, or flume, and in fact no such map was ever filed with the clerk. But in lieu of such a map the plaintiff introduced in evidence a map which plaintiff's engineer testified had been prepared under his direction in March, 1911, nearly three years after posting the notice as claimed by the plaintiff. This map the engineer testified had been prepared from the notes obtained from the engineers who had charge of the work. It showed the direction and course of the ditch and canal, differing from the notice in the matters hereinbefore referred to; that is to say, the map does not show a canal or ditch following the general course and direction stated in the notice, but it does show a canal or ditch passing through other sections and other lands, among others, certain lands of the defendant which the plaintiff now seeks to condemn in this action, notwithstanding the posted and recorded notice did not refer to these lands, and no map was ever filed with the county clerk showing the general or any course of the canal.

Reference has been made to the act of February 22, 1905 (Laws Or. 1905, p. 401). This act was passed in aid of, and in co-operation with, the United States in dealing with arid lands for irrigation purposes in certain states including Oregon under Reclamation Act June 17, 1902, c. 1093, 32 Stat. 388 (U. S. Comp. St. Supp. 1911, p. 662). The act of 1905 does not purport to repeal the prior act of 1891, and a repeal will not be implied unless there is an irreconcilable conflict between the two acts. Beals v. Hale, 45 U. S. (4 How.) 37, 11 L. Ed. 865. The first section of the Oregon act of 1905 is general in its terms, and provides a method of procedure whereby any person, association, or corporation thereafter intending to acquire a right to a beneficial use of any waters for the reclamation of arid lands is required to—

"post in a conspicuous place at the proposed point of diversion a written or printed notice containing the name of such applicant and the stream or other source of supply of such water, a brief description of the point of diversion, and the nature of the beneficial use to which such waters are to be applied, and the exact date of posting, and shall within fifteen days thereafter file in the office of the clerk of the county in which such notice is posted, a duplicate thereof so attested."

This is substantially the requirement of section 4 of the act of February 18, 1891. Section 5 of the latter act further requires that:

"Within ten days from the date of posting such notice, such corporation shall file for record in the office of the county clerk or recorder of conveyances, as the case may be, of the county in which said ditch or canal or flume, distributing ditches, reservoirs and feeders, are situated, a similar notice."

The substantial difference in the two statutes down to this point is this: Under the act of 1905 a "duplicate" of the posted notice must be filed with the clerk of the county within "fifteen days" after posting, while in the earlier statute a notice "similar" to the posted notice must be filed with the clerk of the county "within ten days of the date of posting such notice." This difference is not material; but, as we

shall presently see, the two sections relate to two separate and distinct subjects. Section 5 of the act of 1891 requires that:

"At the time [plaintiff] shall file a map showing the general route of said ditch or canal or flume."

Section 1 of the act of 1905 provides:

"And [plaintiff] shall within thirty days thereafter file in the office of the state engineer a certified copy of such duplicate as filed in the office of the county clerk, which shall be accompanied by such information, maps, field notes, plans and specifications as may be necessary to show the method of construction" at the point of diversion.

That these two sections of the acts of 1891 and 1905 have a very different purpose is plain. The first is to give notice to the public in the locality where the ditch, canal, or flume is to be situated, through the county clerk or recorder of conveyances, as to the proposed general course of the canal, ditch, or flume, so that all parties in interest in that locality may be fully advised and have an opportunity to protect their rights in any manner in which such rights may be involved. The second requires the appropriator to furnish such information to the state engineer by maps, field notes, plans, and specifications as may be necessary to show the method of construction at the point of diversion. It is further required that:

"All such maps, field notes, plans and specifications shall be made from actual surveys and measurements and shall be retained in the office of the state engineer."

This information is to enable the state engineer to perform the duties of his office under the statute with respect to the appropriation of water for a beneficial use in the reclamation of arid lands under the federal act. It does not purport to deal with ditches, canals, or flumes connected with systems of irrigation organized and carried on by corporations exclusively under the state law. The two acts are inconsistent and irreconcilable only in this: They relate to two different subjects.

But it is contended by the plaintiff that the act of 1891 was repealed by the act of February 24, 1909 (Laws Or. 1909. p. 319 et seq.; Lord's Oregon Laws, §§ 6594 to 6672). Concerning this contention it can be said, as has already been said with respect to the act of 1905: The act of 1909 does not purport to repeal the act of 1891. And there is this further answer to the contention: The Legislature of Oregon has declared in effect that it was not so repealed by amending sections 2 and 4 of the act of 1891 by an act passed February 23, 1909 (Laws Or. 1909, pp. 132 and 135; Lord's Oregon Laws, §§ 6526 and 6528). The amendments are stated to be amendments to sections 4994 and 4996 of Bellinger & Cotton's Annotated Codes and Statutes of Oregon. These two sections are the Bellinger & Cotton codifications of sections 2 and 4 of the act of 1891.

It is further contended that the act of 1909 has cured all defects in the appropriations of water arising out of any irregularity or insufficiency of the notice required by law to be posted and recorded. The provision referred to is contained in paragraph 7 of section 70 of

the act of February 24, 1909 (Laws Or. 1909, p. 342; Lord's Oregon Laws, § 6595), as follows:

"And where appropriations of water heretofore attempted have been undertaken in good faith, and the work of construction or improvement thereunder has been in good faith commenced and diligently prosecuted, such appropriations shall not be set aside or avoided, in proceedings under this act, because of any irregularity or insufficiency of the notice by law, or in the manner of posting, recording, or publication thereof."

This section in and of itself recognizes the existence of the act of 1891 and amends it, but does not repeal it. The Supreme Court of the state of Oregon had held that the act of 1891 must be strictly construed, and that whoever claimed anything by virtue of it must bring himself clearly within its terms. Umatilla Irrigation Co. v. Barnhart, 22 Or. 389, 392, 30 Pac. 37. The same rule must necessarily be observed in construing the later act, which provides only for the exercise of the right of eminent domain in behalf of a public use. As we have seen, the plaintiff's irrigation project is not organized to serve the public generally, but for its own use and benefit, and for others who may become stockholders in the corporation it has formed to construct and maintain the proposed irrigation system. The defendant in this case is not seeking in its defense to this action to avoid or set aside plaintiff's appropriation of water for its private project. What it is seeking to do, and has a right to do, is to require that plaintiff shall show in this action a legal right to condemn and take defendant's land for that project, and the curative act is only for the benefit of corporations and persons seeking to acquire property rights for a public use. In our opinion the plaintiff does not come within the provisions of this statute and cannot claim its benefits.

There is a further objection that the only purpose of the statute was to cure irregularities and insufficiencies in the notice, while the objection here is that there was no notice posted or recorded, irregular or otherwise, relating to defendant's lands in sections 3, 21, and 31, in township 15 south, range 42 east, and no map was filed in the clerk's office as required by the statute relating to any lands, and this omission has not been cured by the statute.

As before stated, the plaintiff amended its complaint on the 15th day of March, 1911. In addition to the matters heretofore stated, plaintiff alleged that on the 23d day of June, 1909, it had filed in the office of the state engineer its application for a permit to store the waters of Willow creek and Cow creek to the amount of 36,500 acre feet in a reservoir situated on Willow creek, in township 14 south, range 41 east; such water to be used for irrigation and domestic purposes, and to be distributed and carried and conducted through the canals described in the complaint for the irrigation of lands susceptible of irrigation therefrom. It was further alleged that at the time plaintiff filed with the state engineer maps and field notes in duplicate showing the location of the irrigation works and the lands to be irrigated therefrom; that said application was held by the state engineer until July 30, 1910, when it was returned to the applicant for correction, and said application was thereupon duly corrected and completed by the plaintiff to conform to the requirements of said state engineer and the

state board of control; that such corrected application was refiled in the office of the state engineer on August 23, 1910, and that said application was numbered 147 in said office.

The court found that an application was made by the plaintiff to the state engineer for a permit to store water as alleged in the amended complaint, but did not find that the plaintiff had filed with the state engineer maps and field notes in duplicate showing the location of the irrigation works and the lands to be irrigated therefrom, and did not find that the permit applied for had been granted by the state engineer. In the absence of a permit from the state engineer, plaintiff's claim to a right to divert water under the act of 1909 has not been established.

In Cooley's Constitutional Limitations (7th Ed.) p. 760, the author, speaking of the right to appropriate private property to public use, says:

"When, however, action is had for this purpose, there must be kept in view that general as well as reasonable and just rule that, whenever in pursuance of law the property of an individual is to be divested by proceedings against his will, a strict compliance must be had with all the provisions of law which are made for his protection and benefit, or the proceedings will be ineffectual. Those provisions must be regarded as in the nature of conditions precedent, which are not only to be observed and complied with before the right of the property owner is disturbed, but the party claiming authority under the adverse proceeding must show affirmatively such compliance. * * * So high a prerogative as that of divesting one's estate against his will should only be exercised where the plain letter of the law permits it, and under a careful observance of the formalities prescribed for the owner's protection.'

As I understand the opinion of the majority of the court in this case, it holds, in effect, that under the laws of the state of Oregon relating to irrigation projects, private property may be condemned and taken for a private use. If this is so, it cannot be that a less strict rule is required in observing the statutory requirements than where private property is being taken for a public use. It therefore seems to me that, even upon the theory of the majority opinion, the plaintiff in this case should be held to a strict compliance with all the provisions of law regulating such proceedings, and should be required to show affirmatively that it has complied strictly with all such requirements.

I think I have shown this has not been done, and that the facts found are not sufficient to support the judgment.